UNITED STATES ET AL. *v.* CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC R. CO. ET AL.

No. 379. Argued February 6, 1935.—Decided March 4, 1935.

---

[18] Compare *Pearse* v. *Quebec S. S. Co.*, 24 Fed. 285, 287, 288.

*Assistant Attorney General Stephens,* with whom *Solicitor General Biggs* and *Messrs. Carl McFarland, Elmer B. Collins, Daniel W. Knowlton* and *Edward M. Reidy* were on the brief, for the United States and Interstate Commerce Commission, appellants.

*Mr. John T. Quisenberry,* with whom *Messrs. Walter McFarland, H. H. Larimore, Frank H. Towner,* and *Elmer A. Smith* were on the brief, for the Railroad Companies, appellants.

*Mr. C. L. Taylor,* with whom *Messrs. O. W. Dynes* and *M. L. Bluhm* were on the brief, for the Chicago, Milwaukee, St. Paul & Pacific R. Co., appellee.

*Mr. Earl B. Wilkinson,* with whom *Messrs. Michael F. Gallagher* and *Samuel M. Rinaker* were on the brief, for the Binkley Mining Co. et al., appellees.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

On November 22, 1932, the Chicago, Milwaukee, St. Paul & Pacific Railroad Company (referred to in this opinion as the Milwaukee) filed with the Interstate Commerce Commission a schedule of rates for the transportation of bituminous coal from mines in Indiana to destinations in northern Illinois. Upon complaint by competing

railroads and producers in Illinois, the Interstate Commerce Commission suspended the proposed tariffs and afterwards annulled them. 197 I. C. C. 245; 200 I. C. C. 609. A District Court of three judges has perpetually enjoined the enforcement of the order of the Commission, thereby reinstating the tariffs established by the carrier. 8 F. Supp. 970. The case is here upon appeal. Judicial Code, § 210; 28 U. S. C. § 47a.

The rates in controversy affect the transportation of coal from groups of mines in Indiana known as the Brazil-Clinton and the Linton-Sullivan origin groups to Rockford and Freeport, Illinois, and certain intermediate points. Up to the effective date of the new schedule the rate to Rockford and Freeport from the Brazil-Clinton group had been $1.87 per ton, and from the Linton-Sullivan group $1.92. The proposed change called for a reduction of 17 cents, with the result that the rates between the points mentioned became $1.70 and $1.75 respectively. Reductions ranging from 4 to 10 cents were proposed for other destinations nearer to the point of origin.

In its transportation of bituminous coal the Milwaukee is in competition with lines in Illinois, Indiana and Western Kentucky. We direct our attention first to the situation in Illinois, confining ourselves to facts that have been found by the Commission. For many years there was a parity of rates between the Springfield group in Illinois and the Brazil-Clinton group in Indiana. There was also a customary differential for Illinois groups farther south than Springfield as well as for other groups in Western Kentucky. For example, the rate from Springfield to Rockford was 30 cents less than from mines in southern Illinois. On August 20, 1930, these relations were broken by an order of the Illinois Commerce Commission reducing intrastate rates in Illinois 17 cents a ton. Rates from Springfield to Rockford which had been $1.87 became $1.70; those from southern Illinois, previously $2.17, be-

came $2. Upon the publication of these reductions, Milwaukee complained of them to the Interstate Commerce Commission and asked that they be canceled. 49 U. S. C. § 13. It insisted that the lower schedule would result in undue and unreasonable advantage to persons and localities in intrastate commerce and in undue and unreasonable discrimination against those in interstate commerce. The Commission rendered its decision in March, 1932. It allowed the contested rates to stand in so far as the points of destination were Rockford and Freeport, though it found discrimination, and ordered an increase of five cents a ton, upon shipments to Chicago. Intrastate Rates on Bituminous Coal in Illinois, 182 I. C. C. 537. In respect of the Rockford-Freeport traffic, it held that the intrastate rates might reasonably be higher, but that the like was true of the rates to the same points from the groups in Indiana. 182 I. C. C. 537, at pp. 549, 550. " The principal competition of the Illinois producers at these destinations comes from Indiana, and we find no sufficient justification for requiring any of the Illinois rates to these points to be increased until the low rates from Indiana referred to have been placed upon a level more nearly commensurate with the general level of rates in this territory." In brief the ruling was that the Interstate Commerce Commission would keep its hands off until the rates of interstate competitors had been placed upon a sounder basis. It would not stabilize rates at the then prevailing levels when the rate structure as a whole was in need of readjustment and revision. A refusal to interfere with one of the terms of a proportion is very different from an approval of the proportion as a continuing condition. Restraints were not imposed upon the lines in Illinois, but equally they were not imposed upon those in Indiana. The decision was not a mandate to the carriers to preserve undisturbed an existing relation between rates: the decision was a refusal by the Commission to compel an increase of the rates on

one side of the relation. Those on the other side were subject to change at the instance of the carriers affected to the same extent as they had been before. The forces of competition were left to do their work.

From the situation in Illinois we turn to that in Indiana and Kentucky. Again we confine ourselves to the report unless testimony is mentioned. Six carriers in addition to Milwaukee are in competition for the carriage of coal from groups in Indiana to points in northern Illinois. These lines are the means of transportation for the product of the coal mines at Princeton and Booneville. They compete also to a slight extent for the carriage of coal from the Brazil and Linton groups, though the testimony is that their traffic from those points is only 1% or less, as compared with 99% belonging to Milwaukee. For all these Indiana routes, group rates have been maintained for many years as the outcome of agreement among the carriers concerned. Rates from Linton-Sullivan were five cents higher than from Brazil-Clinton, those from Princeton seven cents higher than from Linton-Sullivan, and those from Booneville ten cents higher than from Princeton. If Milwaukee is upheld in the reduction of its own schedule from Brazil and Linton northward, there is likely to be an attempt by other Indiana carriers to make proportionate reductions from points along their lines.

The change of rates in Illinois had repercussions also upon tariffs in Kentucky. As far back as 1927, the Commission fixed a differential of 35 cents in favor of the roads from the western Kentucky mines as compared with those from the mines in southern Illinois. Illinois-Indiana Coal Cases, 128 I. C. C. 265; West Kentucky Coal Bureau v. Illinois Central R. Co., 172 I. C. C. 279. Upon the lowering of intrastate rates for Illinois carriers, the western Kentucky carriers restored the preëxisting relation between themselves and their Illinois competitors by reducing their own rates to the extent of the established differ-

ential.  The Commission made an order approving the reduction.

With these changes in the rates in Illinois and Kentucky there remained only the rates from the groups in Indiana that were out of line with the proportion maintained for many years.  To restore that proportion Milwaukee filed a new schedule whereby the rates from Brazil-Clinton to Rockford and Freeport, were again placed at a parity with those from Springfield to the same places, the rates from Linton-Sullivan being correspondingly adjusted. This is the schedule that has been disapproved by the Commission.  Two reports were filed, one in November, 1933, the other in April, 1934.  The first, which came from a division of the Commission, was confirmed by the entire body upon denying a petition for rehearing. Suit for an injunction was promptly started by the carrier. Two days before the day appointed for the hearing, the Commission of its own motion reopened the proceeding, and thereafter filed a second report, amplifying the first one.  Following that report the suit was brought to trial upon supplemental pleadings.  The carrier took the position: (1) that the order of the Commission was not supported by the findings; and (2) that irrespective of the findings it was not supported by the evidence.  The District Court gave a decree for the complainant upon the second ground without passing upon the first.  Upon appeal to this court by the Commission and by intervening railroads, the appellees (the Milwaukee and intervening coal producers) renew the grounds of challenge put forward at the trial.

This court has held that an order of the Interstate Commerce Commission is void unless supported by findings of the basic or quasi-jurisdictional facts conditioning its power.  *Florida* v. *United States,* 282 U. S. 194, 215; *United States* v. *Baltimore & Ohio R. Co.,* 293 U. S. 454.

" In the absence of such findings, we are not called upon to examine the evidence in order to resolve opposing contentions as to what it shows or to spell out and state such conclusions of fact as it may permit." *Florida* v. *United States, supra.* Orderly review requires that this objection, being basic and jurisdictional, be disposed of at the beginning.

The jurisdiction of the Commission to cancel the proposed schedule was invoked by the protesting carriers and producers under two sections of the statute, subdivisions 1 and 7 of § 15 and subdivision 2 of § 15a. Section 15 (subdivisions 1 and 7) is to the effect that the Commission shall have power to determine the just and reasonable rate when a rate in force or proposed is found to be unjust or unreasonable or unduly discriminatory or otherwise unlawful. Section 15a is to the effect that in the exercise of this power to establish just and reasonable rates the Commission shall give due consideration, among other factors, " to the need, in the public interest, of adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service; and to the need of revenue sufficient to enable the carriers, under honest, economical, and efficient management, to provide such service."

The second report of the Commission is a long and discursive narrative. Two paragraphs at the end give the key to its meaning [200 I. C. C. 621, 622] :—

" We find that the proposed rates if permitted to become effective would lead to a disruption of the rate structure on coal in the Indiana and related areas, thus impairing the revenue of the carriers serving those areas and their ability to provide the adequate and efficient transportation service contemplated by section 15a of the act; that they would cause a disruption of the individual groups from which the rates are proposed; and that they would

cause a disruption of the long-standing rate relation existing for competitive purposes, between the several Indiana groups.

"We find that the proposed rates would be unreasonable and in violation of sections 1 (5) [which denounces unreasonable charges] and 15a (2) of the act [which has been summarized above]."

The statement in the second of these paragraphs that the proposed rates would be "unreasonable" must be read in the light of the report as a whole, and then appears as a conclusion insufficient as a finding unless supported by facts more particularly stated. Cf. *Florida* v. *United States, supra,* at p. 213; *Southern Pacific Co.* v. *Interstate Commerce Comm'n,* 219 U. S. 433, 449. There is no suggestion in the report that the rates have been so reduced as to be less than compensatory. True they do not reach the maxima beyond which charges are excessive. On the other hand, they do not pass the minima beyond which charges are too low. A zone of reasonableness exists between maxima and minima within which a carrier is ordinarily free to adjust its charges for itself. *Texas & Pacific Ry. Co.* v. *United States,* 289 U. S. 627, 636; *United States* v. *Illinois Central R. Co.,* 263 U. S. 515, 522. We lay to one side cases of discrimination or preference or rivalry so keen as to be a menace to the steady and efficient service called for by the statute. Interstate Commerce Act, § 15 a. Those tendencies excluded, "a carrier is entitled to initiate rates and, in this connection, to adopt such policy of rate making as to it seems best." *United States* v. *Illinois Central R. Co., supra.*

Subjected to these tests, the finding by the Commission that the new rates are unreasonable is seen to be nothing more than a deduction from the paragraph immediately preceding, wherein we learn that the schedule, if put into effect, will disrupt the rate structure in Indiana and re-

lated areas and disturb groupings and differentials maintained for many years. This brings us to the question whether such disruption and disturbance may be deemed a sufficient reason for taking from a carrier the privilege of reaching out for a larger share of the business of transportation and initiating its own schedule to help it in the struggle. For an answer to that question, other facts, exhibited with greater particularity in other parts of the report, must be brought forward and considered. Those affecting the Indiana groups may conveniently be stated first; those affecting groups in Illinois afterwards.

Every change of a rate schedule, either voluntary or involuntary, is a disruption *pro tanto* of the rate structure theretofore prevailing. Plainly such a disruption without more is no sufficient reason for prohibiting a change. The Indiana carriers by long continued coöperation have maintained a fixed schedule of differentials between mines in the southern group (Princeton and Booneville) and mines farther to the north. There is not a fact stated in the report to indicate that it will be unjust or impracticable to apply the new Milwaukee rates to the other lines in Indiana after increasing them by the differentials hitherto prevailing. There is not a fact to indicate that the rates so reduced will be less than compensatory or that capacity for service to the public will be impaired or put in jeopardy. "The raising of rates does not necessarily increase revenue. It may in particular localities reduce revenue instead of increasing it, by discouraging patronage." *Florida* v. *United States, supra,* at p. 214. As applied to the Indiana groups, the broad conclusions of the report, when related to the supporting findings, amount to this and nothing more, that the new schedule for Milwaukee is likely to be followed by new schedules maintaining the same ratio for other lines in Indiana. Even if the outcome for those lines is a diminution of the profits (the return being none the less compensatory), this without more

does not make it wrongful for Milwaukee to restore the long standing parity between Brazil and Springfield. At the very least the findings should inform us, if only approximately, of the extent of the expected loss; they should make it clear whether the impairment of revenues will be trivial or substantial, for only thus can the impairment be related to capacity for service. Cf. *Florida* v. *United States,* 292 U. S. 1, 9. Nothing of the kind is shown. The schedules are to be congealed as they exist, because if not congealed they will be fluid, fluidity is change, and change has the potency, if not the promise, of disturbance. As to conditions in Indiana, this and hardly more is the teaching of the report.

We pass to the relation between the Indiana groups and those in Illinois. As we have seen, parity of rates had been maintained for many years between Indiana lines transporting coal from Brazil-Clinton to northern Illinois and Illinois lines transporting coal from Springfield. There was no complaint by the Commission during those years that the relation was unfair. There was no holding to that effect when orders of the state commission prescribing lower rates in Illinois were kept in operation against the protest of Milwaukee. Intrastate Rates on Bituminous Coal between Points in Illinois, *supra.* The significance of that decision has been considered already in the course of this opinion. As we have striven to make clear, the Commission did not rule that the effect of the new rates was to establish a fair relation, still less the only fair one, between Illinois and Indiana, a relation to be maintained as something fixed and constant. The findings then made are repeated by quotation in the report in this proceeding without comment or explanation that would give them another meaning. If the schedule in controversy is to be rejected as oppressive or unreasonable, the grounds for the rejection must be looked for somewhere else than in the earlier decision.

We are warned by the new report, however, that a change once permitted has a tendency to spread. The acceptance of the new schedule for Milwaukee will lead, it is said, to requests for proportionate reductions by other lines in Indiana, and this in turn to new reductions by lines in Illinois and even in Kentucky, the outcome being characterized in the argument of counsel, though not in the report, as a rate war between the roads. The threat of such a war may be a reason for rejecting a new schedule if the rate relation previously existing is a fair one, or even, we may assume, if the Commission is without power to avert the reprisals and thereby nullify the threat. Neither of these conditions is satisfied in this case. The Commission does not hold that the existing rate relation is intrinsically sound and fair. On the contrary, it expressly concedes that the rate situation as between the Illinois and Indiana groups may be in need of correction, though it expresses the belief that this should not be done in any piecemeal fashion.* The point of the decision is not that present rates are sound, but that they must be maintained, even if unsound, for fear of a rate war which might spread beyond control. The danger is illusory. The whole situation is subject to the power of the Commission, which may keep the changes within bounds. If Illinois lines attempt to lower their rates again, a proceeding will be available to maintain a fair relation. If the lines in Kentucky, operating in interstate commerce, apply for new reductions, the supervisory power of the Commission will subject them to the rule of reason. But other remedies even more plainly adequate are at hand in case of need. Under § 15 of the statute the Commission of its own motion may conduct a comprehensive inquiry into the rates of all the lines within the area of controversy, may fix the fair relation between one line and another,

* See the last two paragraphs of the first report by Division No. 2, which the second report has readopted and confirmed.

and may build the structure of the rates accordingly. *Florida* v. *United States,* 292 U. S. 1; *United States* v. *Louisiana,* 290 U. S. 70.

In the light of these considerations it is not the Milwaukee that is subject to the reproach of dealing with the matter piecemeal. All that the Milwaukee has done is to initiate a schedule which must be upheld as lawful unless adequate reasons are presented for setting it aside. Cf. *Anchor Coal Co.* v. *United States,* 25 F. (2d) 462; *Atchison, T. & S. F. Ry. Co.* v. *United States,* 279 U. S. 768, 773. The reproach of piecemeal action is incurred by the Commission, which has not adjudged the fairness of the relation now subsisting between Illinois and Indiana rates, which has not questioned its own capacity to prevent unjust reprisals, which has put off to an indefinite future the remodeling of the rate structure for all the carriers affected, and which has left this particular carrier helpless in the interval. In brief, a schedule of lowered tariffs has been canceled though the facts that control the validity of the reduction have yet to be determined. This was not a full discharge by the Commission of an immediate responsibility. It was inaction and postponement. Responsibility was shifted from the shoulders of the present to the shoulders of the days to come.

We would not be understood as saying that there do not lurk in this report phrases or sentences suggestive of a different meaning. One gains at places the impression that the Commission looked upon the proposed reduction as something more than a disruptive tendency; that it found unfairness in the old relation of parity between Brazil and Springfield; and that the new schedule in its judgment would confirm Milwaukee in the enjoyment of an undue proportion of the traffic. The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between

conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. *Beaumont, S. L. & W. Ry. Co.* v. *United States,* 282 U. S. 74, 86; *Florida* v. *United States,* 282 U. S. 194, 215. We must know what a decision means before the duty becomes ours to say whether it is right or wrong.

The decree should be affirmed, and it is so ordered.

*Affirmed.*