**BALTIMORE & O. R. CO. et al. v. UNITED STATES.**

**No. 1070.**

District Court, D. Delaware.

Sept. 24, 1935.

John W. Huxley, Jr., and Ward & Gray, all of Wilmington, Del., Carleton W. Meyer, of New York City, Joseph F. Eshelman, of Philadelphia, Pa., and Francis R. Cross, of Baltimore, Md., for plaintiffs.

Elmer B. Collins, Sp. Asst. to the Atty. Gen., for the United States.

J. Stanley Payne and Daniel W. Knowlton, both of Washington, D. C., for Interstate Commerce Commission.

Wilbur La Roe, Jr., C. R. Marshall, Frederick E. Brown, and Arthur L. Winn, Jr., all of Washington, D. C., and Howard Duane, of Wilmington, Del., for interveners West Virginia Pulp & Paper Company et al.

Charles E. Cotterill, of New York City, for intervener Endicott Johnson Corporation.

Before BUFFINGTON, Circuit Judge, and DICKINSON and NIELDS, District Judges.

DICKINSON, District Judge.

The bill complains of orders of the Interstate Commerce Commission fixing the maximum rates on china clay or kaolin shipped from points in the South to points of destination in what are known to this record as Central, Trunk Line, and New England territory, and awarding reparations.

The bill asks that the orders be set aside. The Interstate Commerce Commission is a rate-making body. This court is not. It is settled so finally that citations of authority to establish the principle are uncalled for that the enforcement of such orders may not be restrained merely because the court differs in judgment from the Commission as to what the rate should be. The court may enjoin only when the rate was fixed by the Commission without evidence to support the order, and thus was, in the accepted phrase, arbitrary or

capricious, or was based upon the application of an unsound principle of law. The formal complaint is of both. There is no complaint that the rate fixed is unduly low in the sense that it is, again in the accepted phrase, confiscatory. The absence of such complaint is doubtless due to the circumstance that the rates fixed by the Commission for Central territory, which would be expected to command the highest rates, are higher than the rates which the carriers had themselves voluntarily established and still maintain. These voluntarily maintained rates are likewise lower than the maximum established rates for New England territory against which the complaint is mainly directed. The plaintiffs have not availed themselves of the maximum rates fixed for Central territory. There may, of course, be an explanation for this, but without it on the face of things they would not be heard to complain of rates as too low when they themselves were voluntarily maintaining lower rates for a higher priced service.

We have said that the complaint is of an order fixing rates. The real complaint is, however, not of the rate fixed, but of the theory on which the plaintiffs assume the rate was fixed by the Commission. There is something alluring in the chain of logic by which the advanced proposition is reached. It begins with the principle, which is conceded by the defendant, that a dry rate cannot be depressed because of established water competitive rates. It then goes to the fact, likewise conceded, that the class rates established had in them this water competitive element. The order under attack establishes rates on the basis of a percentage of the class rates. The conclusion is then reached that the complained of rate is measured by water competition rates in violation of the admitted legal principle.

Stated in another way, the argument is this: The Commission fixed class rates for dry hauls near the Atlantic Coast at a low figure because of the then supposed or existing water competition, although now practically absent or negligible. The rates were, however, fixed, whether rightly or wrongly, on this basis. The courts afterwards ruled that the proper rate was a fair rate for the dry haul, whatever a water haul rate might be. The class rates thus rested on an unsound and unstable foundation. The clay rates fixed by the instant order are based on the first class

rates. The foundation being acknowledged to be unsound and unstable, the superstructure built upon it must be visited with the like condemnation.

This conclusion is a non sequitur. The exposure of the fallacy in the reasoning by which it is reached discloses that the real complaint of the plaintiffs is not of the substance of the rate order made but is merely a criticism of the terms in which the order is expressed. The order as made fixes a rate of $7.50, or whatever it may be, for a haul from, say, McIntyre, Ga., to a destination in New England. If this were the only tariff or charge meant to be fixed by the order, it could have been expressed in specific terms of $7.50. This would have been the determination of a fair and reasonable rate by the Commission under all the evidence, without reference to any water competition. The order fixing rates must, however, be so expressed that the rates to other points of destination could likewise be figured. This compelled resort to a more general mode of expression which was found in a percentage of class rates. The result was the same—a rate of $7.50 from McIntyre, Ga., to the New England destination. It would by no means follow that, because the class rates reflected water competition, the fixed rate did likewise. If the class rates had been depressed because based on water competition, the fixed rates could have avoided this influence by a variation in the percentage. This justifies the comment made that this complaint voices, not a substantial complaint of the rate, but merely a criticism of the terms in which expressed.

The formal complaint that the rate was fixed without evidence of what a reasonable rate would be must be intended to restate, in another form, the objection already discussed. It could not be meant to be an absolute statement. The consideration of rates began in 1927 and was continued for several years, including four appeals by the plaintiffs for rehearings. During these protracted hearings testimony and evidence was introduced which required volumes to record, together with exhibits numbered by the hundreds. Evidence, it is true, is judged by its quality, not by its mere volume. Here, however, there was evidence, the discussion of which by the Commission in their report of July 12, 1930, alone occupies thirty printed pages. Aside from this, the rates fixed as reasonable are more than what the carriers have themselves said

are reasonable. This admission as against the carriers would be evidence of the reasonableness of the rates fixed. We could not make the finding of an absence of all evidence. Light is thrown upon the merits of the bill before us by the circumstance that three applications for a review of the order by the Commission were made before any complaint was voiced except against the reparation orders. These orders call for the payment of $82,000, and claims thereunder, it is stated, may reach $200,000. It may be that they supply the real ground of complaint. The plaintiffs acquiesced in the rate orders almost five years without complaint.

■ The bill asks us to review the reparation orders as well as the rate orders. Our jurisdictional power as a specially constituted statutory court to do the former is denied. Jud. Code § 24 (27), 28 USCA § 41 (27). The reparation orders reflect a mere fact finding based on the rate-fixing order. The views expressed on the rate-fixing orders apply also to the reparation orders and lead to a dismissal of the bill for want of equity. In view of this, the question of jurisdictional power to pass upon the reparation orders is of no importance. It would not seem to have much in any event. If we are without jurisdictional power to entertain it, the bill is properly dismissed; if without equity, it is likewise properly dismissed. In either event it is dismissed. This is, of course, from the viewpoint of the trial court.

Thus stands the cause on a general view and consideration of its broad merits. A closer view and more particular consideration leads to the same result. The bill should be dismissed.

The report of the Commission is criticized on the ground that it does not conform to the requirements called for in United States v. Chicago, M., St. P. & P. R. Co., 294 U. S. 499, 55 S. Ct. 462, 79 L. Ed. 1023. This is unjustified. The criticism is particularly directed (1) to the condemnation of the rates prevailing in the New England territory before 1930, and (2) in expressing the maximum reasonable rates in terms of a percentage of the first class rates.

The first and supplemental reports of the Commission fully and adequately assign the reasons for the rulings made. The Commission in its report of July 12, 1930, found the rates charged by the railroads before 1930 on kaolin from points in the south to points in the northeast of Pittsburgh to have been unconscionably high. It based this finding on considerations drawn from ample evidence. Among them were that (1) comparison of the rates before 1930 disclosed a great disparity between the rates charged by the railroads to points east and those charged to points west of Pittsburgh, the former being very much in excess of the latter; (2) in reversal of the accepted rule, the rates on long hauls were proportionately higher than on short hauls; (3) the rates from the more northern points of production to the same or like points of destination were higher proportionately than from the more southern points of shipment. This discrimination was dictated by the selfish interests of the railroads which enjoyed a monopoly of the favored shipments; and (4) the rates as established were fixed at what was found under ample evidence to be fair and reasonable, and reparation was awarded for the excess of the old excessive, exorbitant, and oppressive charges.

The report of the Commission further discloses that it found that a reasonable maximum rate on kaolin hauled to points in the New England territory was fairly measured by 16 per cent. of the first class rates, among other reasons, because, (1) as already stated, the railroads in the Central territory lying between Pittsburgh and the Mississippi had voluntarily for years maintained rates on kaolin which were the equivalent of 16 per cent. of the first class rates, and continued so to do after the maximum rates fixed by the Commission allowed them to charge more, and (2) a 16 per cent. rate on kaolin was fairly comparable with the established rates on other commodities, such as brick clay, bricks, and cement. As also before stated, water competition did not affect the finding of what was a fair rate.

■ The rate-fixing order, being neither arbitrary nor capricious nor violative of any rule of law, should stand and the reparation orders should likewise stand for what they may be worth as evidence of the damages sustained by injured shippers.

[6] Much time and space has been devoted to a showing and denial that the New England rates are lower than the Central. In itself, this is of no moment, as a rate must stand upon its being fair and reasonable,

not upon a comparison with another rate. Interstate Commerce Commission v. Chicago, R. I. & P. R. Co., 218 U. S. 88, 30 S. Ct. 651, 54 L. Ed. 946.

A discrepancy is, moreover, not proven by a comparison of equal length of hauls from different producing points into different territories. Groupings are permitted to the carriers, and no satisfactory comparison can be made without them. The carriers, as several times stated, have not as yet availed themselves of the maximum rates allowed by the order in Central territory. The fact of discrepancy, if it be one, as it may be, is only advanced to bolster up the argument that the New England rates were depressed because of water competition. This has been sufficiently discussed.

In compliance with the applicable equity rule, we file herewith answers to the requests submitted for findings of fact and conclusions of law, and state our own findings and conclusions as follows:

1. A finding by the Interstate Commerce Commission of a fair and reasonable maximum rate of charge to be made by railroads for interstate shipments, made upon supporting evidence received and considered and not made in violation of any rule of law, establishes the lawful rate.

2. The finding in the instant case was made upon evidence which supports it, and is in conflict with no rule of law.

3. The report of the Commission vindicates its fact findings by a full and adequate reference to the supporting evidence before it and its conclusions by a statement of the legal grounds on which based.

4. The rates established by the Commission were fixed without reference to, and were unaffected by, any water carrying competitive rates.

5. The instant bill should be dismissed, with costs, for want of equity.

There is no need to make special reference to the adjudged cases further than to say that the conclusions reached are in accord with the cases to which we have been referred.

To give definiteness of date for appellate and other purposes to the decree entered, none is now made, but a formal decree in accordance with this opinion may be submitted.

BUFFINGTON, Circuit Judge.

I dissent in this case and base such dissent on two simple grounds:

First. The Commission has not in this case complied with the standards of requirement laid down by the Supreme Court in late cases. Atchison, T. & S. F. Ry. Co. v. United States, 295 U. S. 193, 55 S. Ct. 748, 79 L. Ed. 1382, decided April 29, 1935, and United States v. Chicago, M., St. P. & P. R. Co., 294 U. S. 499, 55 S. Ct. 462, 79 L. Ed. 1023 decided March 4, 1935.

Second. The rate question before the Interstate Commerce Commission is whether the rate is reasonable for the service performed. As between Eastern and Central rail hauls, the distance traveled and the service rendered is practically the same, and therefore an equality of rate follows. But in fixing the rate on first class freight the Commission in the Southern case differentiated the rate, not on account of nonequality of service, but on account of the eastern territory having water competition. In fixing the rate on the kaolin or clay here involved, the Commission took as its basis the differential rates established on first class rates and applied to kaolin the same differential it had allowed first class rates in the Southern case. In other words, and in effect, it held, because there was an established differential in first class freights, there should be a corresponding differential in kaolin. But, after the Southern case, it was held the existence of water competition in no way affected the reasonableness or unreasonableness of a land haul. Now this erroneous inequality of rate between Eastern and Central roads in first class freight is the real foundation of a corresponding inequality of rates in the kaolin rate, and the Commission has not found as a fact any other justifying ground. It seems to me, therefore, that the basic standard of inequality in first class rates between Eastern and Central territory cannot be utilized and legalized to make a corresponding differential in the case of kaolin.