**NATIONAL WATER CARRIERS
ASS'N et al.**

v.

**UNITED STATES et al.**

United States District Court,
S. D. New York.

Feb. 26, 1954.

Christopher E. Heckman, New York City, and Ned J. Parsekian, East Orange, N. J., for plaintiffs.

C. H. Johns, Washington, D. C., for Interstate Commerce Commission.

Henry D. Boynton, New Haven, Conn., and William A. Colton, New York City, for the railroads.

Before L. HAND, Circuit Judge, and GODDARD and DIMOCK, District Judges.

L. HAND, Circuit Judge.

This action is before a "three judge court," assembled under § 2325 of Title 28, U.S.Code: it seeks to invalidate an order of the Interstate Commerce Commission, establishing rates for the transportation of crushed stone between Westfield, Massachusetts and Calverton, Long Island, and between Branford, Connecticut and the same place. It comes on for final hearing upon the complaint, an answer of the United States and the Commission, an answer of the railroads, the report of the Commission, and a certified copy of the evidence taken before it. The Commission's order was made in a proceeding brought by the plaintiffs to annul a rate, established by the railroads between Westfield and Calverton. The plaintiff, National Water Carriers Association, is a corporation, whose members include common carriers by water; i. e. by scows and tugs, plying between points on the north shore of Long Island Sound and points on the south shore. The plaintiff, New York

Trap Rock Corporation, is engaged in producing and selling crushed stone, which it transports in its own, as well as in chartered, scows. The New Haven Road in August 1952 established and promulgated a joint rate for itself and the Long Island Rail Road of $1.65 per ton for the carriage of such stone between Westfield, Massachusetts, and Calverton, where the Navy was building an airfield, for which it needed large quantities of stone to pave the runways. The complaint alleged: (1), that the rate established by the roads was not compensatory for the rail transportation in question; and (2), that, even if it was, it was so low as to be destructive of any "water-truck" competition between Branford and Calverton. The Commission, through an examiner, heard testimony from both sides, and filed a report followed by an order, enjoining the rate established by the roads, substituting a rate of $1.75 from Westfield to Calverton, and—upon its own initiative—establishing a rate of $1.65 from Branford to Calverton.

Before considering the two questions raised in the complaint we must decide whether the order includes shipments in single carloads, or is to be limited to "multiple carloads." The rate from Westfield to Calverton was "published" in the following words: "Stone, crushed, not coated. In bulk, in gondola or other open cars, carloads, minimum weight 90 per cent of marked capacity of car furnished, except when cars are loaded to cubical or visible capacity actual weight will apply." The Commission's order is in two paragraphs, of which the first directed the roads "to cease and desist * * * and thereafter to abstain from * * * collecting for the transportation of crushed stone in carloads * * * rates which differ from those prescribed in the next succeeding paragraph hereof"; and that paragraph directed them "to maintain and apply to the above-described traffic * * * rates of $1.56 and $1.47 per ton respectively" with an added "increase of 12 per cent." The order should be read "on" the published

rate: that is, the Commission must be understood to have incorporated the words used by the roads, except in so far as they changed them; and "in carloads" in the order meant whatever "carloads" meant in the "published" rate. It is plain that the word was there used to define what must be the contents of the "gondola or other open cars," if the roads were to accept them. They must be loaded either to "90 per cent of their marked capacity"; or "to cubical or visible capacity," in which event they must be weighed. So far as concerns the mere text, it would not be reasonable to attribute to the word, "carloads," any other significance. Moreover, this construction is confirmed, if we look either at the report, or at the evidence. The report first declared that "crushed stone rarely moves under the class rates and for single-line application the defendants maintain commodity-rate scales substantially on the level of the so-called Buckland scale * * * Thus, the New Haven's single-line scale rates on crushed stone for 150 and 204 miles (the joint-line distances to Calverton from Branford and Westfield) are $2.10 and $2.27, respectively." It then went on to say that "it has long been the practice of the New Haven to establish upon request, specific commodity rates for single-line application on this commodity lower than the scale to large projects requiring a considerable volume of crushed stone to meet unregulated water and truck competition." The roads did "establish upon request" the Westfield rate as one of their "specific commodity rates * * * lower than the scale"; and they did so for a job "requiring a considerable volume of crushed stone to meet unregulated water and truck competition." Nobody disputes that it costs less per car to transport a large number of cars than a small; and the report was certainly speaking of a rate, confined to "a considerable volume." Moreover, this need not be left to inference, for the testimony is conclusive. From this it appears that the Westfield rate was estab-

lished to cover the Navy airfield only; and the roads meant to cancel it when the job was over. Besides, there was "a gentlemen's agreement—that traffic will move in volume"; which meant "2500 tons a day"—about 40 cars. The rate was also based "upon previous commitments we have had from crushed stone people where we have put in similar rates." We do not forget that the same witness, when pressed upon cross-examination, said that, even without "commitments" for a large "volume" the rate would "probably be compensatory" for single cars; "but," he at once added, "I wouldn't want to continue the haul. It would be right on the border line." Quite aside from whether this testimony would support the Westfield rate, if applied to single cars, it must be obvious that it was not so understood. Finally, we agree with the plaintiffs that, if it does include single cars, there is no substantial evidence to support it as "compensatory." We need not say that the rates are limited to shipments of 2,500 tons a day; we assume that the Commission did not mean to freeze the rate so precisely; but we do construe it as limited to such "multiple carloads" as will make the cost per ton approximately the same as that of 40 carloads.

■ ▬ With this as a premise we come to the first of the two questions, posed by the complaint: i. e. whether the two rates are "compensatory"; and first, as to the Westfield rate. The roads put in evidence that the "out-of-pocket cost" of this was $1.30, "based on a loading of 65 tons per car, and the handling of the loads and empties in 40-car lots." This the Commission thought too low; the cost was "somewhat greater than the cost as shown" by the roads. They compared the rate of $1.65 with the "single-line scale rate of $2.27" for crushed stone for a distance equal to that between Westfield and Calverton; and noted that it was 72.7 per cent of the "single-line scale rate" and "yields 48.3 cents per car mile." Exhibit 9 was a list of 50 rates for crushed stone from Westfield (and also from Branford) to various termini on the New Haven; among other things it showed the percentages of "specific rates" to "mileage scale rates" and the "average revenue per car." A percentage of 72.7 compares very favorably with other "specific commodity rates" for in 43 of these the percentage was less than this. It is true that in only five was the "average revenue per car mile" less than 48.3 cents; but on the other hand, the "revenue on specific rate based on 59.74 tons", of $98.57 for the rate in suit was higher than in all but one of the fifty. However, although the Commission thought that $1.65 "compares favorably * * * with the specific commodity rates above referred to," it did not accept that rate, because the comparison was with "single-line scale rates," and ignored the "arbitraries for the joint haul and the portion of the haul on Long Island." It did, however, find that $1.75 was "no lower than necessary to meet the competition" of water carriage; and that it was also "not so low as to cast a burden upon other traffic." We understand by the second of these findings that the rate was "compensatory" to the roads; and by "compensatory" we understand that it covered cost and a minimum of return on investment. To this second finding we shall first address ourselves. The appraisal of "compensatory" rates by judges who have no specialized acquaintance with the field, should never take the place of the Commission's, except in cases of some patent disregard of the evidence. It includes allowances for all sorts of more or less concealed contributory services, the proper returns for which are not quantitatively measurable —returns that can at best be only conjectured by those most familiar with the subject matter.[1] So much as to the Westfield rate; and little need be added as to that from Branford to Calverton.

1. State of New York v. United States, 331 U.S. 284, 328, 335, 67 S.Ct. 1207, 91 L.Ed. 1492.

It is true that no evidence was offered, specifically addressed to the cost of this route, which is 54 miles shorter than the Westfield route; but the Commission adopted a ten cent differential, because Branford had for long been "accorded a uniform differential on westbound traffic of ten cents under Westfield." In each of all the fifty instances, recorded in Exhibit 9, there appears a constant differential between "specific rates" from Branford and from Westfield of twenty cents on eastbound traffic and ten cents on westbound. It was permissible for the Commission to take this as evidence upon the issue of "discrimination" between points on the same route. "Comparisons of other rates in the same or adjacent territory, while not a conclusive test of reasonableness of a rate under investigation, have probative value." [2] We conclude therefore that both rates were "compensatory"; and that the Westfield rate did not discriminate against the Branford rate. We reserve for the moment the plaintiffs' complaint that they were deprived of a fair trial as to the Branford rate.

■■ The second question is whether the rates, though "compensatory," were "lower than necessary to meet the competition" of the "water-truck" transportation from Branford to Calverton. The report does not contain any express finding as to what would be "compensatory" for this; but we understand that the Commission meant to accept the plaintiffs' figures of the actual outlay of the New York Trap Rock Company. That company used its own "scows" at an estimated cost of 29.2 cents a ton, and it paid towage charges of 29.4 cents: about 60 cents in all. To this it added trucking charges to Calverton of $1.15 per ton; a total of $1.75. To this must be added a tax of three per cent on the towage and trucking charge—say four cents. Moreover, it would seem that there should be added some return on the investment, which at four per cent

would add seven cents, and make a total of $1.86, eleven cents above the rate fixed. This competitive disadvantage by "water-truck" transportation is, however, altogether deceptive, unless we make allowance for the fact that the rail rate covered carriage no further than the siding at Calverton, whence there was a trucking charge of forty cents a ton to the runways. That gave the plaintiffs an overall competitive advantage of 29 cents in the case of Westfield and 19 cents in the case of Branford. To this the plaintiffs reply that, even though this were an answer as to the particular job in question, the rates were not so limited, but apply generally to Calverton, as terminus ad quem; and that it is unfair to assume that in all cases there will be a trucking charge of 40 cents from the siding to all places where the stone is to be used. That is of course true; but it is irrelevant. The Commission were dealing with rates, fixed by the roads for a particular occasion—a "specific commodity rate" for a "large project." They found the Westfield rate of $1.65 "preferential of *the shipper at Westfield*" and "prejudicial to *the complainant shipper* from Branford"; and, although the rates they fixed were "for the future," they were to cover a job not yet completed on February 3, 1953, when the report was filed. We cannot agree that a rate supported by adequate evidence should be annulled, because it is not expressly limited to the conditions that may be necessary to its validity. If the plaintiffs had proved that there would in fact be other shipments that would require a smaller trucking charge, something might be said in favor of annulling a rate that did not contain any limitation. However, they proved nothing of the sort; they ask us to annul the rates upon the mere chance that there may be such; and that we will not do. Nevertheless, we agree that the rates are to be understood as applicable only to shipments that involve a trucking charge of sub-

2. Youngstown Sheet & Tube Co. v. United States, 295 U.S. 476, 480, 55 S.Ct. 822, 824, 79 L.Ed. 1553.

stantially 40 cents a ton from the siding to the place of delivery.

■ The plaintiffs challenge the rates notwithstanding such a limitation; they say that there was no evidence from which the Commission could determine that, even when so construed, they were not less than was necessary to meet competition. The statutory provisions are two. The preamble to the Interstate Commerce Act,[3] states it as the policy of Congress "to recognize and preserve the inherent advantages" of all "modes of transportation"; and § 142 of the Transportation Act of 1920 [4] provides that it is "the policy of Congress to promote, encourage, and develop water transportation * * * and to foster and preserve in full vigor both rail and water transportation." The first of these clauses came before the Supreme Court in Interstate Commerce Commission v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102, upon the following state of facts. Wheat from the west had been carried through Chicago to eastern destinations both by "all rail," and "barge-rail," routes. The second consisted of a "barge-leg" from points on the Great Lakes west of Chicago to that city, where the wheat was put into cars and carried east by rail. In order to divert this traffic to the "all rail" routes, the roads loaded a differential upon the "rail-leg" of the "barge-rail" route; and this the Court held to be unlawful, declaring that the provision we have mentioned and parts of the Act of 1920 "flatly forbid the Commission to approve barge rates or barge-rail rates which do not preserve intact the inherent advantages of cheap water transportation," 330 U.S. at page 577, 67 S.Ct. at page 899. That "inherent advantage" lay in the fact that the barges could outbid the roads for that part of the through route that was to the west of Chicago, and that they could therefore get the traffic. This in turn was because their costs were so low that they could operate at rates that would at once be compensatory to them, would outweigh the inferiority of their service, and would yet undercut any rates that were compensatory to the roads for the western leg of the all-rail routes. The plaintiffs at bar do not claim any such advantage over the roads; on the contrary, their position is that their costs are so high that a rate compensatory to them, but low enough to outweigh the inferiority of barge carriage, will be higher than the rates established by the Commission, which, as we have said, were compensatory to the roads.

Were this the measure of "inherent advantage," it would follow that water carriers would always have such an advantage, whenever they could operate at a rate that would be at once compensatory to them, and would outweigh any inferiority in their service, provided such a rate was less, not then rates that would be compensatory to the roads, but less than the current rail rates. Such an advantage would not be "inherent" in water carriage at all, but "accidental," for it would only depend upon what the rail rate chanced to be at the time. Nor is it an answer to substitute for "compensatory" rates "normal rates," unless we interpret "normal" to incorporate the amount necessary to support the service: i. e. unless we refer it to something economically required by the carriers. Indeed, if we do not import into the adjective, "inherent," the factor of compensatory rates, the "policy" will subject shippers to the continuance of rail rates that, as in the case at bar, have no significance except that they have not been theretofore challenged, though they are higher than need be. It must be remembered that the preamble to the Interstate Commerce Act, unlike § 142 of the Transportation Act of 1920, does not affect to favor one "mode" over the other, but only to "preserve the inherent advantages" of all. Not so § 142 of the Transportation Act of 1920, a part of whose design is "to promote, encourage, and develop water transpor-

3. Preceding § 1, Title 49, U.S.C.A.

4. § 142, Title 49, U.S.C.A.

tation". And so, if, as the plaintiffs say, they cannot survive at the rail rates established by the Commission, and, if those rates are compensatory to the roads, it is the roads that have the "inherent advantage"; and, so far as concerns the Interstate Commerce Act, it is only they who might complain of the rates, which they do not. For these reasons we hold that the plaintiffs cannot succeed under the preamble to the Interstate Commerce Act of 1940.

 However, the same is not true of § 142 of the Transportation Act of 1920, which the plaintiffs also invoke, for any rates established by the Commission must be such as will "foster and preserve in full vigor both rail and water transportation." By this we understand, as we have already suggested, that Congress meant that the contrasted rates should offer substantially the same inducement to shippers; for then the market would be equally open to both "modes," and both would survive "in full vigor," or would at least share equally in whatever was the traffic. The plaintiffs have not shown that the Commission's rates did not do just that; and it is clear that this was their purpose, as appears from an analysis of the report itself. That declared that "rail rates reduced from a normal level to meet water competition may be no lower than necessary to meet the competition and may not be so low as to cast a burden upon other traffic"; and it found that $1.65 was lower than necessary; for, as we have said, it was "unreasonably low and unduly preferential of the shipper at Westfield and unduly prejudicial to the complainant shipper from Branford." Then the report concluded that these defects could be corrected by the rates established; and the phrase, "no lower than necessary to meet water competition," plainly means a rate that, although it will "meet," will not put an end to, water competition, but will "foster and preserve in full vigor both rail and water transportation," so far as any rate can do so. Whether the rates, in fact established, did accomplish that result is another matter; and one on which there is no specific evidence, if by that one means evidence of exactly what differential, added to the rail rate, will be enough, but only just enough, to balance the relative "inherent advantages" of rail carriage, and put both services on an equal footing. Fixing such a differential involves appraising in dollars and cents the relative attractions of the services, and we cannot see how that can be done with any certainty until the product has been tried out; the best we can expect is that it shall be done by those who are most familiar with such matters, and done impartially. The Supreme Court has often expressed its awareness of the difficulties of such inquiries, and has given the widest latitude to the Commission. The "question does not become important until the policy of the lawmakers appears to have been flouted * * *. The most that it can mean, unless, conceivably, in circumstances of wanton or malicious injury, is that where carriers by land and water are brought within the range of the regulatory powers of the Commission * * * there shall be impartial recognition and promotion of the interests of all."[5] (It is true that the Court had before it an occasion where the water carriers were also "regulated," as is not the case here; but that makes no difference in principle.) Again, although "the authority of the Commission to increase rates in order to remove discrimination, even though existing rates may be compensatory, is not unlimited", "the balancing and weighing of" conflicting "interests is a delicate task"[6]; so that "whether a discrimination in rates or services of a carrier is undue or unreasonable has always been regarded as peculiarly a question committed to the judgment of the administrative

5. Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 288, 54 S.Ct. 692, 694, 78 L.Ed. 1260.

6. State of New York v. United States, 331 U.S. 284, 347, 67 S.Ct. 1207, 1240.

body".[7] Certainly the situation at bar called as directly as possible for the exercise of the specialized competence that we are to impute to the Commission; and, in the absence of evidence showing that they misconceived their duty, it is not feasible for us to reverse their finding with any assurance that another would more nearly accomplish the purpose.

Finally, as we have already said, the plaintiffs complain that the Branford rate was never in issue before the Commission; and that as to it they were deprived of their day in court, which, if they had had it, would have shown, not only that $1.65 was lower than necessary to meet competition, but also that it was less than "compensatory." The consideration of the Branford rail rate came into the case upon the plaintiffs' own initiative. The 10th Article of their complaint before the Commission alleged that "The rate of the defendant New Haven Railroad for transportation of crushed stone from Branford, Conn. (the plant of the New Haven Trap Rock Corporation) over the main line of defendant New Haven Railroad, for many years past has been 20¢ lower than from Hampton quarries, Westfield, Mass. over said defendant's main line. Under said Supplement No. 10, the rate for crushed stone from Branford, Conn. to Calverton (Long Island) N. Y., will be greatly higher than from Westfield, Mass., to the same destination, although the Branford-Calverton rail line distance is the shorter." The 17th Article of the same complaint alleged that the Westfield rate gave "an undue and unreasonable advantage and preference to the locality of Westfield, Mass. and the locality of Calverton, Long Island, N. Y. over the localities, ports and gateways of Branford, Conn." and two Long Island "localities." That locution—"localities, ports and gateways" —was lifted in ipsissimis verbis from that part of § 3(1) of the Interstate Commerce Act that forbids discrimination of rates between "localities" served by the same carrier. On what theory the plaintiffs can suppose that these allegations did not open the issue of discrimination between Westfield and Branford, we cannot understand; or why they chose to neglect to put in any proof upon an issue they had deliberately interjected into the proceeding. As things stood, the Branford rate cried aloud for the application of the long established differential of ten cents between "specific rates." If the plaintiffs failed to put in any evidence on an issue so injected in the case, it was their fault; they had had their chance. The Commission might have relieved them, and reopened the hearing, as the plaintiffs asked them to do. Indeed, it was the first of their claims for a rehearing that the Branford rate had been established without any request by them; and without giving them any chance to be heard. That petition was the only remedy open to them; and its grant rested altogether in the Commission's discretion.

It follows that the rates should not be annulled, when construed and limited as follows; and we so construe them. (1) They are to be understood as applicable only to shipments of substantially 40 cars at a time; and (2) they are applicable only to shipments that do involve a trucking charge of substantially 40 cents a ton from the siding at Calverton to the place of delivery.

The complaint will be dismissed.

DIMOCK, District Judge (concurring in the result).

The opinion of the Court has my concurrence in every part except where it holds that these plaintiffs have no "inherent advantage" over the rail carriers. In my opinion, these plaintiffs have an inherent advantage over the rail carriers. The majority holds that the plaintiffs cannot succeed because they have no such inherent advantage. I would hold that they could not succeed because

7. Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 481, 81 L.Ed. 659.

the Commission carefully fixed rates which preserved that inherent advantage.

In my view, the Commission properly expressed the rule when it said "rail rates reduced from a normal level to meet water competition may be no lower than necessary to meet the competition, and may not be so low as to cast a burden upon other traffic." If the rail rates are no lower than necessary "to meet", as distinguished from "to eliminate", water competition, any inherent advantage of water competition will be preserved.

Congress has declared its policy to "preserve in full vigor both rail and water transportation".[1] Congress has also declared it to be its policy "to recognize and preserve the inherent advantages" of all "modes of transportation".[2] These two provisions immediately present the problem of maintaining rail and water transportation in full vigor and, at the same time, preserving the inherent advantages of each. Obviously, both injunctions cannot be taken literally and co-exist. If the inherent advantages of rail transportation are such that water transportation cannot survive in competition with rail transportation, it would be impossible to preserve those inherent advantages and still keep water transportation in full vigor. The Commission harmonized the two injunctions by adopting the rule implicit in the sentence above quoted from the Commission's report. I understand that rule to be that the rail carrier may not reduce its rates from a normal level to meet water competition below the point necessary to meet the water competition and, even if necessary to meet water competition, may not reduce the rate so low as to cast a burden upon other traffic. To illustrate, if the only Congressional injunction were to preserve in full vigor both rail and water transportation, that would require the Commission to keep rail rates so high that existing water competition would not be stifled even though the rail rates so fixed were

higher than a normal level. The additional injunction, however, that the inherent advantages of both modes must be preserved requires that the rail carrier shall not be required to increase its normal rates. If the rail carrier's inherent advantage is such that it can, at its normal rates, drive the water competition out of business, it may do so despite the injunction to preserve all modes of transportation in full vigor. If, however, water competition has sufficient inherent advantage so that it can survive with rail rates kept at the normal level, the rail rates, as stated by the Commission, "may be no lower than necessary to meet the competition". In other words, the rail rates may be reduced to the point, and only to the point, where rail and water competition each can survive in full vigor. Rail rates may not be reduced even to that point if it is so low as to cast a burden upon other rail traffic. Wherever it would be necessary to go beyond that unpassable point in order to meet water competition, the inherent advantage of the water carriage will drive out the rail competition just as the inherent advantage of rail carriage will drive out water competition if water carriage cannot exist in the face of rail carriage at normal rates.

All this involves very difficult determinations: (a) the "normal" rate, (b) the rate which "meets" competition and (c) the rate at the point just sufficient not to cast the burden on other traffic or, in other words, the "compensatory" rate. These determinations, though difficult, are not impossible.

The "normal" rate, in the sense used by the Commission, is the rate that the rail carrier would have fixed but for the water competition. Ordinarily, the rate charged by the rail carrier before water competition appeared would be a good measure of such a normal rate. It would be proper to assume that a rate so charged would yield a fair return.

1. § 142, title 49 U.S.Code.

2. Preceding § 1, title 49, U.S.Code (Preamble to the Interstate Commerce Act.)

The rate which "meets" competition is the lowest rate of the rail carrier which will leave open to the water carrier the field where the less exacting of the shippers are willing to put up with the inferior service of the water carrier in order to take advantage of its lower rates.

The compensatory rate, as above stated, is the rate which is just sufficient not to cast a burden on other traffic. I agree with the majority that it contains a minimum return on investment. In the case of the rail carrier, it is the lowest rate in the range within which the carrier, but for special statutory directions such as the ones involving preservation of modes of transportation in full vigor and preservation of inherent advantage, would be free to adjust its charges. See U. S. v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 506, 55 S.Ct. 462, 79 L.Ed. 1023.

The Commission's rule, which seems to me correct, is that the rail carrier's rates cannot be reduced below normal where there is water competition unless the water carrier's rates are so low as to take away from the rail carrier business which would naturally have gone to the rail carrier. The rail carrier has a natural following of shippers who need its fast and dependable service. The water carrier has a natural following of shippers who can put up with its slow and uncertain service. When the rail carrier offers its superior service at a rate inordinately low the water carrier's natural following is enticed to use the rails in spite of the lower rates of the water. When the water carrier offers its inferior service at a rate inordinately low the rail carrier's natural following is enticed to use the water in spite of the superior service of the rails.

The normal rail rates must not be cut to a point where the rail carrier invades the water carrier's natural market. That would rob the water carrier of its "inherent advantage". On the other hand, if the water carrier's rates have to be so high that the water carrier's natural following finds it more advantageous to use the rails and pay normal rail rates, water carriage has no inherent advantage and the rail carrier will be permitted to charge its normal rates. Similarly, if the rail carrier's compensatory rates are so high that the rail carrier's natural following finds it more advantageous to use the water and pay the low water rates, rail carriage has no inherent advantage and the rail carrier will not be permitted to reduce its rates below the compensatory level.

As I understand the language used by the Commission, it is a contradiction in terms to speak of barge carriage rates low enough to outweigh the inferiority of barge carriage which will be higher than the rail rates established by the Commission. The only way that anyone can tell whether a water carriage rate is low enough to outweigh the inferiority of water carriage to rail carriage is to compare the water carriage rate with the rail carriage rate. To outweigh the inferiority of water carriage to rail carriage the water carriage rate per ton must be lower—much lower—than the rail carriage rate per ton established by the Commission.

When we are considering whether a rail rate has been reduced farther than is necessary to meet water competition we must compare the reduced rail rate with the compensatory rate for the corresponding water carriage. Whether or not this compensatory rate is low enough to outweigh the inferiority of water carriage depends upon the rate charged for the superior rail carriage. If the rail carrier's rate is lower than this compensatory water carriage rate, water carriage will not be preserved in full vigor as required by Congress. If this lower rail carriage is the rail carrier's normal rate, that in itself demonstrates the inherent advantage of rail carriage over water carriage. If, however, there is a rate level, between the maximum of the normal rail carriage rate and the minimum of the compensatory rail carriage rate, enough higher than the compensatory water rate so that the differential in favor of the wa-

ter rate outweighs, in the judgment of water carriage's natural following, the inferiority of the water carriage, rail rates must be fixed at that level.

It is true that under the Commission's rule a rail carrier might be required to keep its rates at a point far above the compensatory level in order not to drive water carriage rates below a compensatory level. The fact that the resulting rail carriage rates were almost normal and the water carriage rates were only compensatory would not, however, mean that there was no inherent advantage in the water carriage. The inherent advantage to the shippers who pay rates is at least as important as to the carriers who receive them and, in the case supposed, the less exacting shippers who could put up with the slow and uncertain water carriage would have the benefit of the inherent advantage of the lower rates charged for water carriage.

The avowed purpose of the Commission was to fix the rail rates at the level required by the rule and above defined. Plaintiffs complain that the rail rates were fixed at a level where the differential in favor of the water rates did not outweigh the inferiority of the water service.

As the majority opinion demonstrates, the rail rates which were fixed left a substantial differential in favor of water carriage rates. I can find no reason for saying that this differential was too small to outweigh the inferiority of barge service and the Commission necessarily found that it was great enough to do so. After finding that the rates fixed by the rail carriers were "lower than necessary to meet the barge-truck competition", the Commission declared "that such unlawfulness can and should be removed by the establishment of" the rates which it ordered in force. It would be captious to say that the Commission did not find that the level of the rates that it fixed was the level necessary to meet barge-truck competition.

The Court's opinion indicates a belief that water carriage can have no inherent advantage unless compensatory water carriage rates are so low as to require the rail carrier to reduce its rates below the compensatory level in order to meet water carriage competition. The majority explain the references to "inherent advantage" in the opinion of I. C. C. v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102, by the statement that, there, the barge carriers' costs were so low that they could operate at rates that would at once be compensatory to them, would outweigh the inferiority of their service, and would yet undercut any rates for the same haul that were compensatory to the roads. I do not think that the Supreme Court in the Mechling case treated the barge carriers as able to undercut compensatory rail rates except in the sense that they were able to carry at rates per ton which were less than the rates per ton at which the railroads were able to carry. Justice Black wrote, 330 U.S. at page 570, 67 S.Ct. at page 896, "Although barge lines were much slower than railroads, they were less expensive to operate and therefore could afford to transport freight much more cheaply than railroads." There was no finding in the Mechling case that the barge carriers' rates were so low that the rail carriers would have to reduce their rates below a compensatory level to meet barge carriage competition. The Commission there merely found, 330 U.S. at page 578, 67 S.Ct. 894, that the barge carriers were charging less than the railroads could afford to charge for the same haul. Far from a state of affairs where the railroads could not meet barge competition without reducing their rates below a compensatory basis, it appears that the railroads under their existing rates were to some extent meeting the competition. The Supreme Court goes no farther than to say, 330 U.S. at page 571, 67 S.Ct. 894, that "much" of the railroads' business from localities that could be served by either

barge or rail shifted to barges because of the cheaper barge rates.

I cannot, therefore, think otherwise than that the water carriers in the case at bar showed an "inherent advantage" within the meaning of the Congressional injunction. Since, however, I find evidence that the Commission recognized and gave full effect to that inherent advantage I agree with the majority's result.