[No. 1403-3.    Division Three.    August 12, 1976.]

WASHINGTON ASSOCIATION FOR RETARDED CITIZENS,
*Respondent,* v. THE CITY OF SPOKANE, ET AL,
*Appellants.*

*Richard F. Wrenn, Corporation Counsel, Howard A. Anderson,* and *Huppin, Ewing & Anderson,* for appellants.

*Gary J. Gainer* and *Richter, Wimberley & Ericson,* for respondent.

GREEN, J.—The Washington State Association for Retarded Citizens (WARC) applied to the Spokane Plan

Commission for a special use permit to construct a "group" home" in an R-1 single-family, residence zone. After public hearing, the commission voted 6 to 1 to approve the permit, conditioned upon compliance with setback and parking requirements. This ruling was appealed to the City Council, and after public hearing and review of the commission record, the ruling was reversed by a 4 to 3 vote. The Superior Court reversed the council's decision and reinstated the commission's ruling. The City appeals.

The issues before this court revolve around the question of whether the trial court erred in concluding that the council's action was arbitrary and capricious, and clearly erroneous. We reverse.

The property on which WARC seeks to construct its group home consists of three lots, 50 feet by 117 to 119 feet. The proposed structure would consist of two stories and contain about 6,000 square feet on the ground level, at a cost of $150,000 to $200,000. The building would house 18 people, including two houseparents. The group would be between 18 and 40 years of age.

The property in question faces north on Twenty-Ninth Avenue, an east-west arterial, in the approximate center of the block. This block and the area to the immediate north, south and east is zoned R-1, single-family residences. The testimony before the Plan Commission and the City Council, as well as an examination of exhibit F, shows that the residences in the R-1 zone are modest in size and well kept. About two blocks to the west, across Ray Street—a north-south arterial—is Lincoln Heights, a community shopping center which includes a bowling alley, theater, restaurants, grocery, drug, and other stores.

The issuance of a special permit is governed by the following provisions of the Spokane Comprehensive Zoning Ordinance:

Section 210.20. Special Permits for Uses in Any Zone. 1. The following uses may be allowed in any zone by special permit from the commission after public hearing, provided that the *location thereof is found by the commission to be in harmony with proper community devel-*

*opment, and provided reasonable conditions shall be imposed to protect the surrounding property and zone in which such use is to be located:* Airports, art galleries; museums; universities; stadiums; coliseums; hospitals; nursing homes; retirement homes or boarding homes as defined in Chapter 253, Laws of 1957, of the State of Washington; orphanages; *nonprofit* institutions for educational, philanthropic, and *eleemosynary* uses; railroad right-of-ways provided that no loading, storage, or switching shall be permitted in any "R" zone; sewage treatment plants; electric power plants; municipal crematories and refuse dumps; radio and television broadcasting stations and transmitter towers; cemeteries; recreational developments operated by private organizations or individuals after a finding by the commission that the recreational development will be of benefit to the community; and any use ruled by the commission to be similar in nature to the above uses in that said use possesses peculiar location, design or special problems that need to be reviewed or controlled by special permit.

Section 310.20. Uses Not Mentioned. 1. The commission may permit in a zone any uses not described in this ordinance after a finding that such use is similar to permitted uses in said zone and in keeping with the spirit and intent of the zone wherein the use is to be located.

Section 310.05. Rules and Interpretation. . . .

2. The Commission shall interpret and rule on the meaning, intent, and proper general application of the provisions in this ordinance.

(Italics ours.) The commission construed these provisions to include a WARC group home. While much of the discussion before the commission concerned the plans for the home and the nature of the activities to be conducted in it, the remaining discussion centered on whether the structure, the number of occupants, and the nature of the activity were in keeping with the homes in the surrounding area. This discussion was appropriate under section 210.20 set out above, as well as the spirit of section 315.10 which provides:

1. Wherever this ordinance authorizes the issuance of a special permit by . . . the commission, based on a finding that such use will not be unduly detrimental to

other properties and/or contrary to the spirit and intent of this ordinance, it shall be the responsibility of the applicant . . . to present evidence to the satisfaction of said body . . . that said undue detriment will not result from the permission requested. In addition to such evidence the administrative officer, Board of Adjustment, or the Commission may consider such other information as it deems to be relevant.

The proponents of the special permit, WARC, presented testimony that the structure would be in harmony with proper community development and would not be unduly detrimental to the surrounding area; whereas, the opponents, many of whom were residents of the immediate neighborhood, presented evidence to the contrary. Six commission members agreed with the proponents and voted to issue a conditional special permit. One member agreed with the opponents and voted against issuing the permit.[1] This

[1] Mr. Trogdon, an architect, in voting against the special permit, said:·

"I am not at all, of course, opposed to the program, and my concern really is the size and capacity of the proposed facility in an 'R1' Zone, and I am really concerned, since this is the first one, that we might be establishing a precedence [sic]. I think the location generally is very good. I feel specifically that it is not good in this 'R1' zone with a family of this size. I feel very strongly about that—reluctantly I feel strongly about it. I really hope we don't place homes of this size in 'R1' areas. I think they could very well go in other zones of a multi-family nature and be more appropriate. It's a deep concern of mine on· this particular piece because it is almost perfect, but it isn't perfect. Being in an 'R1' area, it really bothers me. *I think it's detrimental to the surrounding area as far as the existing residences are concerned.*

". . . I think the size of the lot is satisfactory. I just think that it's in an 'R1' area where there are small rather modest, single-family dwellings, and I don't think it's compatible with the neighborhood . . . because the character and scale changes. It's really unfortunate that it's so close and yet so far, in my own mind." (Italics ours.)

Mr. Clegg: "I was wondering if Mr. Trogdon would consider a smaller number or smaller development."

Mr. Trogdon: "It certainly would, but at the same time I appreciate the financial feasibility of a program like that, and I think it would be an extreme hardship on them to succeed and we don't want to establish that, because if it doesn't succeed we've got an even greater problem. Unfortunately, there probably are other sites and they are probably more expensive. I feel that it isn't really well located as it should be. Being the first one, I think we'd better be extremely careful about it." (Italics ours.)

ruling was appealed to the City Council and, after public hearing, it was reversed by a vote of 4 to 3.

First, the City contends that the trial court misconstrued the role of the City Council in its review of the commission's ruling and as a result erred in concluding that the reversal was clearly erroneous, arbitrary, and capricious.[2]

---

[2]The following conclusions of law to which error has been assigned indicate the court's conception of its role:

"3.1 The determination of whether a legislative body is acting in an administrative capacity or in a legislative capacity, is a judicial question as pointed out in *Durocher vs. King County*, 80 Wn.2d 139, 492 P.2d 547 (1972)."

"3.2 At the time that the Spokane City Council had its hearing regarding the WASHINGTON ASSOCIATION FOR RETARDED CITIZENS, and at the time of its decision regarding the disposition of that matter, it was a legislative body acting in an administrative capacity rather than a legislative capacity under the authority, doctrine, and rationale of *Lund vs. Tumwater*, 2 Wn. App. 750, 472 P.2d 550 (1970)."

"3.3 Courts can, on a review of an administrative act of a city, determine whether or not the action was reached upon due consideration of all the facts, or stated another way, was clearly erroneous in view of the entire record."

"3.4 Although a city council need not enter written findings of fact in support of its review of a plan commission determination, the city council must, nevertheless, be guided by adequate standards when it acts, as here, in an administrative capacity."

"3.5 If an ordinance governing the issuance of special use permits does not specify standards to guide the administrative body in issuing or denying such a permit, that body must make findings of facts showing the basis upon which it denies a permit; and, if it fails to do so, the usual presumption of reasonableness does not attach to its decision and the burden is upon the administrative body to show that the denial was not arbitrary or capricious."

"3.6 Under the philosphy [*sic*] that is developing as a result of *State ex rel. Standard Mining & Development vs. Auburn*, 82 Wn.2d 321, 510 P.2d 647 (1973), the Spokane City Council acted arbitrarily and capriciously, upon consideration of all the circumstances of this case."

"3.7 The Spokane City Council's having taken its action without given [giving] any reason for it, in light of the testimony taken at the city council hearing, the extensive plan commission record of testimony, staff work, background investigation, research, and the recommendations of every interested department of the City of Spokane which the Spokane City Council indicated that it had before it, did not have the appearance of fairness which such a hearing should have."

"3.8 The action of the Spokane City Council was clearly erroneous in light of all the surrounding circumstances and the record."

We agree.

The City Council, as the governing body of the City created the Plan Commission which is not a creature of statute. *See Nelson v. Seattle*, 64 Wn.2d 862, 866, 395 P.2d 82 (1964); Const. art 11, § 11. Under the ordinance, the council delegated certain duties to the commission, but reserved to itself the right to review the commission's rulings. The scope of this review is spelled out in section 340.30:

> Rulings of the commission may be appealed to the city council, which city council shall *after public hearing have the power* to affirm, overrule, or alter said rulings.

(Italics ours.) Under section 340.40, a notice of appeal must be submitted in writing to the commission, and

> Thereupon the . . . commission whose ruling or decision is being appealed shall immediately transmit all papers constituting a record of the case to the body which is to hear the appeal. *The body hearing the appeal shall, at its hearing, receive such additional evidence as it deems to be relevant.*

(Italics ours.)

The City contends that the council is not bound by the findings of the commission, but rather, the council is free to reach its own conclusion based upon its own public hearing and the record from the Plan Commission. In other words, the hearing before the council is de novo. On the other hand, WARC contends that under these provisions, the council's review is quasi-judicial and, therefore, its scope of review is restricted to a determination of whether the commission followed the guidelines of the ordinance. We agree with the City's position.[3] Section 340.30 requires a public hearing and section 340.49 mandates the reception of "such additional evidence as it deems to be relevant." Hence, the review is de novo. In analogous circumstances,

---

[3]Here, we are concerned with construction of the city ordinance which provides for an administrative hearing at the Plan Commission level and a de novo review by the City Council. While we do not disagree with the authorities relied on by respondent and the trial court, those decisions are not in point or precedential.

the court in *State ex rel. Morrison v. Seattle*, 6 Wn. App. 181, 192, 492 P.2d 1078 (1971), said:

The requirement in the zoning ordinance that the City Council hold a public hearing on appeals from its board of adjustment (sections 26.21 and 26.35) is a clear indication that a de novo hearing upon the merits is contemplated. If the council were bound by the findings of the board of adjustment, there would be no point in requiring a public hearing. *See Anderson v. Pittenger*, 197 Cal. App. 2d 188, 17 Cal. Rptr. 54 (1961).

There is nothing in the record to indicate that the council or commission failed to follow the guidelines contained in the ordinance.

Second, the City contends the court erred in concluding that the council's action lacks the appearance of fairness and is, therefore, arbitrary and capricious since no findings of fact or statement of reasons were set forth in the council's reversal of the commission ruling. We agree.

■■ We have carefully reviewed the Comprehensive Zoning Ordinance for the City of Spokane and do not find any requirement that the council enter findings on appeal setting forth the basis upon which it affirms or reverses a ruling of the Plan Commission. We, therefore, conclude that such findings are not necessary. As the court said in *State ex rel. Morrison v. Seattle, supra* at 191:

There is no requirement in the zoning code that the City Council must, on appeal, enter written findings of fact. We think the contention of appellants was effectively answered and disposed of in *State ex rel. Smilanich v. McCollum*, 62 Wn.2d 602, 384 P.2d 358 (1963) at 607: "There is no requirement [in the Snohomish County zoning code] of a written document, and the word 'findings' means nothing more than administrative determinations."

This principle is, in our opinion, fully applicable here. When the council acted to grant Safeway's applications, it determined that the "facts" necessary to the grant were present. The record itself is available to review whether or not such determination had a factual basis. Findings of fact on permits, license, and so forth would

constitute an onerous burden upon already overburdened city councils.

Moreover, a review of the record before the City Council demonstrates that one of the considerations before it under the guidelines contained in sections 210.20 and 315.10 was whether a structure housing 18 people was in harmony with or unduly detrimental to the surrounding area.[4] Some of this concern was expressed by Mayor Rodgers after the other council members split 3 to 3 in their vote:

> I'm voting "yes." [in favor of reversal]. I would like to qualify that by saying that . . . this group home doesn't meet my idea of what we should be doing in the way of group homes. I have asked the staff to prepare a permanent ordinance stating specifically where we may have group homes for the mentally retarded, and I think that this matter should be settled on that basis. If we do it on . . . [the] basis we're doing it presently, we will continually have controversy and misunderstanding, and in my judgment, in the long run, the community and the mentally retarded will be better served if we have a

---

[4] The following comments of council members are illustrative of this consideration: The Mayor said: "I'm so much concerned with the size of the building that goes in here, and I assume we're involved with economics of the situation. This is a neighborhood, as I drove around there yesterday afternoon, of quite small homes. Is it practical, reasonable, to reduce this to be more compatible with the neighborhood, in the sense that we're not going to put, essentially, apparently, a nice but rather substantial dormitory type facility into a 'R1' zone?"

Councilman Stratton inquired: "I have a question. Mr. Gainor [Gainer] [counsel for WARC], it seems to me that the point the appellants [opponents] are making quite strongly is the size of the lot and the size of the building itself and not who's going to be in it as much as they are concerned about that size."

Mr. Gainer replied: "Yes, I appreciate that."

Councilman Division inquired: "How many square feet in the building? May I ask that?"

Mr. Orgill: "The building has over 7,000 square feet; however, the ground floor coverage is what we're concerned about in coverage on the site, and that's under 6,000 square feet . . ."

Councilman Jones: "May I ask a question? Is this multiple-story?"

Mr. Orgill: "Two stories."

Councilman Stratton: "Just so that we get the figures, once again, here we have the lot size and square feet as approximately, give or take a foot or two, 17,700."

Mr. Orgill: "That's correct."

permanent understanding of where and how group homes may be established.

Aside from the technical aspects as to setback requirements and parking, the question of whether the structure harmonized with or was unduly detrimental to the surrounding area required a subjective judgment. The members of both the council and the commission disagreed on this question. It is well settled that:

> Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.

*Lillions v. Gibbs*, 47 Wn.2d 629, 633, 289 P.2d 203 (1955); *Anderson v. Island County*, 81 Wn.2d 312, 501 P.2d 594 (1972). In this case, there is no hint in the evidence before the commission or the council that the denial of the special permit was grounded in discrimination against WARC. If there was such evidence, this court would look differently upon this matter. Here, the record discloses honest differences of opinion about a subjective matter; and in that circumstance, the determination of the City cannot be considered to be arbitrary or capricious.

While the courts may disagree with decisions of municipal bodies, such disagreement, standing alone, should not provide the basis for a court's interference in municipal zoning decisions. Courts should only interfere where the constitutional requirements of due process are not met or where the action is discriminatory and therefore arbitrary. When these situations do not exist, zoning decisions should rest with the political body of the municipality which is answerable to the voters. As the court aptly observed in *State ex rel. Randall v. Snohomish County*, 79 Wn.2d 619, 625, 488 P.2d 511 (1971):

> It therefore seems appropriate to emphasize that the role of the judiciary in reviewing such enactments and decisions is limited to the determination of whether they satisfy constitutional requirements and to the determination of whether administrative decisions are arbitrary and capricious or ultra vires. Beyond those limits there

112

are serious questions of wisdom and practicality. But, by long tradition, built upon the principle of separation of powers, such latter matters are beyond the purview of the courts. Such questions are to be resolved by the political, not the judicial, process.

Finally, the City claims the trial court erred in concluding that the action of the council was clearly erroneous in light of all the surrounding circumstances. We agree. The clearly erroneous doctrine is found in the administrative procedures act, RCW 34.04.130(6)(e). It applies only to state and legislative agencies. *See Edwards v. City Council,* 3 Wn. App. 665, 668-69, 479 P.2d 120 (1970), *rev. denied,* 78 Wn.2d 996 (1971). The City in this case is not acting as an agency of the State. Therefore, the act does not apply.

Reversed.

McINTURFF, C.J., and MUNSON, J., concur.