[No. 52566–8. En Banc. August 6, 1987.]

GARY MERLINO CONSTRUCTION CO., *Appellant,* v. THE CITY OF SEATTLE, *Respondent.*

*Casey, Pruzan & Kovarik,* by *Martin Godsil* and *Michael A. Larson,* for appellant.

*Douglas N. Jewett, City Attorney,* and *M. Colleen Barrett, Assistant,* for respondent.

DORE, J.—Seattle's Women's and Minority Business Utilization Ordinance (hereinafter WMBE ordinance) is designed to offer to women and minorities the opportunity to improve their ability to participate in the construction

industry. Seattle Municipal Code (SMC) 20.46. Contractors are required to utilize women and minority subcontractors at certain specified percentages, with the purpose of giving these disadvantaged persons the needed experience to compete in this business. As the United States Department of Transportation stated in reference to highway construction:

> many majority contractors owe their success to the experience gained as a subcontractor/protege. This concept offers tremendous potential to develop and expand the [minority] contracting opportunities in highway construction.

Report of Proceedings, vol. 2 (13.6), at 3.

The Seattle Board of Public Works found that appellant Gary Merlino Construction Company violated this act by underutilizing minority contractors, thereby denying them the beneficial experience which this act seeks to promote. Merlino appeals this finding of underutilization, as well as the Board's sanction that it be prohibited from bidding or working on city contracts for 1 year.

### FACTS

In early 1984, Merlino was the general contractor for a street improvement project for the City of Seattle. As part of its contractual and statutory obligations under the WMBE ordinance, Merlino was required to utilize women's business enterprises on 3 percent of the contract amount, and minority business enterprises on 15 percent of the contract amount. Section 1.A of the WMBE bid specifications stated that "utilization [of Women and Minority enterprises] may be through contracting, subcontracting, joint ventures, procurement of supplies, materials or equipment . . ."

The Seattle Human Rights Department approved the use of subcontractor TNT Concrete, a minority owned business, as part of Merlino's construction bid. Nevertheless, while the project was underway, the Human Rights Department initiated an investigation of Merlino's compliance with WMBE commitments. This investigation focused

on the alleged underuse of TNT Concrete because Merlino loaned it employees and ordered and paid for the concrete which TNT Concrete was supposed to supply. On May 4, 1984, after the project had been completed, the Human Rights Department issued a "Determination of Cause to Believe Contractor Has Not Complied with WMBE Requirements." The Human Rights Department met with Merlino and TNT Concrete on May 18, but failed to resolve their differences.

On May 21, the Human Rights Department issued a "finding of non-compliance with WMBE Requirements." Merlino and TNT Concrete were advised that the Board of Public Works was going to consider the Human Rights Department's findings and decide what, if any, sanction was appropriate. Public hearings were conducted on June 8 and 15, 1984, and the Board unanimously decided that Merlino had underutilized TNT Concrete. The Board also decided to debar Merlino for 1 year.

Merlino promptly filed a writ of certiorari to the Superior Court asking for a review of the Board's proceedings and the 1-year debarment. On February 6, 1985, the trial court affirmed the Board's decision. Merlino appeals. Throughout these proceedings, the order of debarment has been stayed.

### SUFFICIENCY OF EVIDENCE

■ On appeal of a superior court order in a certiorari proceeding, this court makes a de novo review of the agency's record to determine whether the administrative decision was arbitrary and capricious or contrary to law. *Thomsen v. King Cy.*, 39 Wn. App. 505, 694 P.2d 40 (1985). After a de novo review, we find that the Board did not err in determining that Merlino had violated the WMBE ordinance.

The crux of this case is whether or not TNT Concrete performed a commercially useful function, or was merely a prop for Merlino to do the work itself while appearing to comply with the WMBE ordinance. If TNT Concrete did not perform its subcontracted work, then it did not gain the

valuable experience which the WMBE ordinance was designed to promote.

Several facts were presented to the Board which convinced it, and us, that TNT Concrete did not perform a commercially useful function. The TNT Concrete subcontract required it to supply the concrete, as well as perform the paving work. TNT Concrete's credit rating was such, however, that it did not believe it could order enough concrete to complete the job. Rather than find a way for TNT Concrete to overcome this difficulty, with the obvious benefit to its credit rating, Merlino made arrangements for the acquisition of the concrete. Merlino paid the concrete suppliers except for one company, Salmon Bay Sand and Gravel, and issued them a joint check payable to both Salmon Bay and TNT Concrete.

The trial judge, in reviewing the record, made the following observation:

> [I]t isn't simply [Merlino's] saying I'll take care of it, and it isn't (and/or) the making of the phone calls in the morning. It's the whole scenario. The testimony does not show, or fails to show that [TNT Concrete] made any of the arrangements for any aspects of the purchasing of the materials which were . . . inappropriately handled by Mr. Merlino.

Brief of Respondent, at 20. We concur. The evidence shows that TNT Concrete did not perform a commercially useful function and failed to gain the valuable experience or the improved credit rating which the WMBE ordinance was designed to provide. We believe the Board's determination was correct, and was not arbitrary and capricious.

### ADMINISTRATIVE RULEMAKING

Seattle Municipal Code 20.46.060(A) provides that "the Director [of Public Works] shall . . . (3) [a]dopt rules and regulations . . . establishing standards and procedures for effectively carrying out this chapter . . ." At the time that Merlino received the street improvement contract, no such rules had been promulgated. Merlino argues this failure to adopt rules voided any subsequent proceedings, as it had

no notice as to what conduct would be considered in violation of the WMBE ordinance. We disagree. The invitation Merlino received to bid on the street improvement contract specifically stated:

> The Contractor may count toward its MBE or WBE set–aside only expenditures to MBEs and WBEs that perform commercially useful functions in the work of a contract. *An MBE or WBE is considered to perform a commercially useful function when it is responsible for execution of a distinct element of the work of a contract and carrying out its responsibilities by actually performing, managing, and supervising the work involved.*

(Some italics ours.) Report of Proceedings, vol. 3 (13.7), at 2(1)(D)(d)(1) (WMBE Bid Specifications). This bid provided ample notice to Merlino of which subcontracted work could be set aside, and Merlino cannot complain that it did not know that its conduct in relation to TNT Concrete would violate the WMBE ordinance requirements.

## DUE PROCESS

Merlino makes a variety of due process challenges to the procedure the Board used at the WMBE noncompliance hearings. While we note that the transcript of the hearing before the Board shows that it was conducted in an unruly manner, and that the Board should make a more concerted effort to maintain an orderly proceeding, we do not believe, judging from the entire record, that Merlino was denied a fair hearing. Merlino raises a number of other challenges.

## A
### Federal Debarment Procedures

Merlino argues that its 1–year debarment from bidding on city contracts should be reversed because the Board did not follow federal debarment regulations. *See* 49 C.F.R. §§ 29.41–.55. Federal debarment rules, however, apply only to proceedings conducted by an agency defined as an "operating administration." 49 C.F.R. § 29.13. The Seattle Board of Public Works is not an operating administration as

defined by the federal regulations, 49 C.F.R. § 29.13(j), and therefore, those regulations do not apply.

## B
## Findings of Fact

Merlino asserts that the Board's failure to issue findings of fact was erroneous, and that this court should remand the case to the Board for entry of these findings before we review the case. We note, however, that the WMBE ordinance does not explicitly require such findings and Merlino never requested them.

Findings of fact can serve a number of useful functions. They can aid the court in determining whether the evidence supported facts on which the administrative agency relied to make its decision. They can help the courts avoid judicial usurpation of the agency's fact finding function. We are aware, however, of no case in Washington which overturned an administrative decision because no findings of fact were issued when none were statutorily required.

The closest a court in this state has come to that position is the decision in *Pentagram Corp. v. Seattle,* 28 Wn. App. 219, 622 P.2d 892 (1981). In *Pentagram,* the Court of Appeals held that findings of fact were useful to protect the applicant from arbitrary acts, to prevent discrimination and to facilitate judicial review. However, the decision in *Pentagram* did not reverse an administrative body for failure to issue findings of fact, but instead held that absent such findings, the usual presumption of reasonableness does not attach to an administrative body's decision. *Pentagram,* at 229–30.

Nevertheless, in this case, regardless of whether or not a presumption of reasonableness attaches to the Board's decision, it is abundantly clear that Merlino violated the provisions of the WMBE ordinance. Findings of fact, which would ordinarily aid this court in making a de novo review of the administrative record, would be of little use in this

case. We agree with the Board that Merlino violated the WMBE ordinance, and the Board's failure to issue findings of fact is not reversible error.

## C
### Sworn Testimony

■ Merlino claims that the Board should have required witnesses to be sworn before testifying. It claims that failure to administer an oath was a denial of due process. Nevertheless, Merlino did not request sworn testimony when given the opportunity to do so, and we therefore decline to consider this issue on review. *See Leschi Imp. Coun. v. State Hwy. Comm'n*, 84 Wn.2d 271, 274, 525 P.2d 774 (1974).

## D
### Opportunity To Be Heard Regarding the Appropriate Sanction

Merlino also contends that the Board did not give it a meaningful opportunity to be heard regarding the proper sanction. Specifically Merlino claims that the Board's refusal to continue the hearing for 1 week after a violation had been found, but before a sanction had been determined, violated its due process rights. We disagree.

The decision of how to conduct a meeting is left to the discretion of the Board. SMC 3.44.030. The record does not indicate that the Board abused its discretion, as Merlino was given ample opportunity to be heard and to present arguments about the propriety of any sanctions during all stages of the proceedings.

SMC 20.46.080(A)(4) authorizes five sanctions once the Board finds a violation of the WMBE ordinance. Four of those relate to violations detected before or during the pendency of the contract, and the fifth, debarment, is the only one available after the contract has been fully executed. The Human Rights Department urged the Board to adopt a 2-year debarment, the longest sanction possible pursuant to SMC 20.46.080(A)(4)(e). The Board considered this recommendation as well as one for 6 months before

finally agreeing on a 1–year debarment. Report of Proceedings, vol. 2 (13.5), at 71–84. The Board's decision was the product of careful reflection, and the failure to grant a continuance was neither an abuse of its discretion nor a due process violation.

Moreover, throughout the hearings, Merlino had the opportunity to discuss alternate sanctions. From the very beginning of a dispute regarding WMBE ordinance violations, if the Director of Public Works believes a violation of the WMBE ordinance has occurred, he is obliged to attempt to resolve the dispute by conciliation. SMC 20.46-.130. This conciliation had taken place, and neither side could agree on whether a violation had occurred or what sanction should be imposed. Even at this stage, Merlino had the opportunity to present alternate views about the propriety of the sanctions proposed. Furthermore, at the point the Board of Public Works had decided to sanction Merlino, the chairman asked:

[CHAIRMAN]: Mr. Godsil [attorney for Merlino], . . . are you prepared on behalf of your client or is your client prepared to discuss the matter of sanctions today?

Mr. GODSIL: Well, I could only say that it doesn't look to us from our point of view here there's much to discuss.

Report of Proceedings, vol. 2 (13.5), at 65–66. Thus, despite ample opportunity to do so, Merlino chose not to propose other types of sanctions and the Board considered the violations and ordered a reasonable sanction. There was no due process violation.

### E
### Other Issues

Merlino's remaining objections are without merit. Merlino was represented by competent counsel, had adequate notice and an opportunity to respond, could present evidence, and had sufficient opportunity to examine witnesses. Furthermore, its challenge to the evidentiary rulings is not well founded as administrative agencies are not required to follow strict or technical rules of evidence. *Nisqually Delta*

*Ass'n v. DuPont,* 103 Wn.2d 720, 696 P.2d 1222 (1985). The Board's hearing complied with due process requirements.

### EQUAL PROTECTION

Merlino also argues that the Seattle WMBE ordinance violates equal protection guaranties. To the extent it makes this argument on the grounds that these types of set–aside ordinances generally discriminate against nonminority male contractors, we adhere to our earlier decision in *Southwest Wash. Chapter, Nat'l Elec. Contractors Ass'n v. Pierce Cy.,* 100 Wn.2d 109, 667 P.2d 1092 (1983), in which we upheld a virtually identical set–aside ordinance adopted by Pierce County.

■ We reject Merlino's contention that the Seattle ordinance is not sufficiently flexible to fulfill the legislation's remedial purpose. In *Electrical Contractors,* we followed the United States Supreme Court decision in *Fullilove v. Klutznick,* 448 U.S. 448, 65 L. Ed. 2d 902, 100 S. Ct. 2758 (1980), which requires that the means selected in an affirmative action plan be narrowly tailored to address the discrimination which has occurred. "It must sweep no more broadly than necessary to counter the problem upon which its justification rests and must be flexible enough to adjust on a case–by–case basis." *Electrical Contractors,* at 122.

In this case, we believe the ordinance has the needed flexibility and is not overbroad. The plan lists five nonexclusive sanctions for persons violating the ordinance. SMC 20.46.080(A)(4). It compels the Director of Public Works to mediate in the event a perceived violation has occurred. SMC 20.46.130(A). Furthermore, the entire set–aside procedure can be waived if a city contracting authority believes it necessary to do so. SMC 20.46.120. The ordinance does not offend equal protection guaranties.

Furthermore, it is not pertinent that TNT Concrete was not sanctioned in this case. There was no evidence presented that Merlino received disparate treatment because of the race of its owners, and therefore, this equal protection argument is groundless.

## Other Issues

Merlino raises a number of other issues which we find to be without merit. The fact that the Human Rights Department and the Board approved the use of TNT Concrete as a subcontractor and did not question the method of set aside contemplated by Merlino and TNT Concrete did not amount to a waiver of the Board's right to later challenge the set–aside method actually used. The WMBE ordinance does not violate applicable city low bid requirements, as the ordinance and city charter sections in question require that city contracts be awarded to the best bidder and factors other than lowest price must be considered. City of Seattle Charter, art. 7, § 4; SMC 3.44.040.

## Conclusion

This case represents the first time this court has been called on to decide the propriety of a sanction under an affirmative opportunity program existing in this state. The purpose of these ordinances is to give disadvantaged persons the opportunity to obtain needed experience in these fields, and we will not tolerate schemes to circumvent these beneficial aims. Merlino underutilized minority contractors on a city project in violation of the WMBE ordinance. A 1–year debarment is an appropriate sanction for this violation.

We affirm the Superior Court order affirming the Board of Public Works debarment of Merlino for 1 year.

PEARSON, C.J., BRACHTENBACH, DOLLIVER, ANDERSEN, and GOODLOE, JJ., and HAMILTON, J. Pro Tem., concur.

CALLOW, J. (dissenting)—I concur in the manner in which the majority has resolved the questions raised on administrative rulemaking, equal protection and minor issues. However, I dissent from two portions of the decision of the majority. I would hold that the contractor should have been granted an opportunity to make a presentation concerning the appropriateness of the sanction to be imposed and that the administrative body in cases such as this must enter findings of fact. Because the Board summarily imposed

sanctions on the same day that it concluded that a violation had taken place and did not require findings, the cause should be remanded to the Board of Public Works so that the contractor is not unfairly deprived of his right to do business with the City of Seattle without due process.

## I
### THE OPPORTUNITY TO BE HEARD REGARDING THE APPROPRIATE SANCTION

At the conclusion of the second day of hearings, the contractor requested a week's extension to present argument on the sanction to be imposed. The Board proceeded forthwith, after it decided that the contractor had failed to comply with the WMBE set–aside requirements, to decide upon the sanction. The flavor of the hearing and the summary imposition of the sanction is reflected in the last pages of the verbatim report of proceedings which are included as an appendix. A reading of those pages shows that in the last minutes of the hearing the members of the Board recognized that they had always allowed an accused the time to prepare for and present statements and argument relative to the proposed sanctions which the Board should impose. Yet in this hearing the discussion rapidly left this subject for a discussion of whether the board could and should impose sanctions on Don Merlino, as an individual, as well as upon the Gary Merlino Construction Company. From thence the report of proceedings reflects that counsel for the contractor requested time to talk to his client, a Board member stated that the hearing had taken too much time already, the Board discussed what was the appropriate length of debarment, a motion was passed to debar for 1 year and the proceedings concluded at 11:45 a.m. The Board record plainly shows that Board members were not disposed to hearing any argument by Merlino Construction on the matter. Merlino Construction was denied due process when it did not have an opportunity to be heard in a meaningful manner.

The verbatim report of proceedings of these hearings

reflects an emotionally charged and unruly hearing. When public excitement runs high, administrative bodies and courts should become particularly alert to upholding the protections of due process. Here, a substantial part of the earning opportunities of a business has been taken away from that business. By abandoning its previously followed procedures, the Board of Public Works deprived the contractor of the opportunity to at least state its position before sentence was imposed. To have permitted the contractor time to prepare a statement and to present mitigating factors before it was precluded from working for a major customer for a year would have restored the aura of fairness which should have surrounded these hearings, but which was sadly lacking.

As Justice Douglas, concurring in *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 177–79, 95 L. Ed. 817, 71 S. Ct. 624 (1951), stated:

> It is not enough to know that the men applying the standard are honorable and devoted men. This is a government of *laws,* not of *men.* The powers being used are the powers of government over the reputations and fortunes of citizens. In situations far less severe or important than these a party is told the nature of the charge against him. . . . When the Government becomes the moving party and levels its great powers against the citizen, it should be held to the same standards of fair dealing as we prescribe for other legal contests. To let the Government adopt such lesser ones as suits the convenience of its officers is to start down the totalitarian path.
> . . .
> Notice and opportunity to be heard are fundamental to due process of law. We would reverse these cases out of hand if they were suits of a civil nature to establish a claim against petitioners. Notice and opportunity to be heard are indispensable to a fair trial whether the case be criminal or civil. . . . The rudiments of justice, as we know it, call for notice and hearing—an opportunity to appear and to rebut the charge.
> . . .
> It is not without significance that most of the provisions of the Bill of Rights are procedural. It is procedure

that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.

Counsel is entitled to time to prepare a statement and argument on the contractor's position before a sentence is imposed. Counsel should certainly be entitled to (a) discover other punishments or sanctions that have been imposed so that he can demonstrate these comparables in order that sanctions be uniform, and to (b) research and present alternative ways of sanctioning his client or alternatives to sanctions. All counsel know that given time to think they can do a better job.

The violation of the WMBE is supported by the record. The contractor failed to properly utilize the minority's subcontractor, thereby thwarting a major purpose of the ordinance, to wit: to provide educational benefits as well as employment benefits to the minority subcontractor. However, we do not make a rule for this case alone. It is important that the rules of due process be applied to every citizen, whether it be the innocent or the malefactor. If we deny due process for the violator, soon it will be denied to the violated. Concepts of due process have not been conceived for law abiding citizens alone but also for law breakers. These procedural rights are for sinners as well as saints, and it is only with the proper application of due process principles that administrative bodies as well as courts can tell properly and with due deliberation the one from the other.

## II
### THE REQUIREMENT THAT FINDINGS OF FACT BE MADE

The Seattle Municipal Code (SMC) places upon the Board of Public Works the duty of insuring that all public works activities and contracts for public works projects are carried on in a manner consistent with the city charter and

applicable law. SMC 3.44.010, .040(A). The Seattle Municipal Code further provides in SMC 3.02.090 that in all contested cases

F. The record in a contested cause shall include:

. . .

5. Proposed findings and conclusions;

. . .

H. Findings of fact shall be based exclusively on the evidence and on matters officially noticed.

The subchapter dealing with administration and enforcement of the Seattle Human Rights Department requires in SMC 14.04.120 that the results of an investigation be reduced to written findings of fact and that findings of fact shall be furnished promptly to the respondent and the charging party. Recognition is given throughout the Seattle Municipal Code to the appropriateness of findings of fact being entered by administrative bodies. Yet, here the Board of Public Works, which acted as the quasi–judicial body and imposed sanctions, did not enter findings of fact. Thus, all the reasons why findings should be entered are ignored and we do not have before us any written support or foundation for the imposition of the sanctions imposed.

*Pentagram Corp. v. Seattle,* 28 Wn. App. 219, 229, 622 P.2d 892 (1981) posits that an administrative agency is not required to issue written findings when it is acting in an appellate capacity. *See Messer v. Snohomish Cy. Bd. of Adj.,* 19 Wn. App. 780, 578 P.2d 50 (1978); *Washington Ass'n for Retarded Citizens v. Spokane,* 16 Wn. App. 103, 553 P.2d 450 (1976); *State ex rel. Morrison v. Seattle,* 6 Wn. App. 181, 492 P.2d 1078 (1971). However, *Pentagram,* at 228–29, provides:

*Parkridge v. Seattle,* 89 Wn.2d 454, 573 P.2d 359 (1978) . . . prospectively imposed the requirement that in a rezone case findings of fact and conclusions or reasons be given for the action of the administrative body in entering its decision. *See Hayden v. Port Townsend,* 93 Wn.2d 870, 613 P.2d 1164 (1980). The requirement of written findings and conclusions in *Parkridge* was based upon

the determination in *Barrie v. Kitsap County,* 84 Wn.2d 579, 527 P.2d 1377 (1974), that a rezone hearing is a quasi–judicial proceeding because it is adjudicatory as compared to legislative in nature. Since we similarly find that the issuance of a special building permit is an adjudicatory action, we conclude that written findings and conclusions are necessary in order to establish the basis upon which the decision was made, and to provide a procedural safeguard against arbitrary and capricious action.

The Board of Public Works is the ultimate body to impose sanctions for violation of the WMBE ordinance in "failure to utilize" cases. It is the body which is adjudicatory rather than appellate as to the sentencing function. The Board is the administrative agency and the forum that imposes the sanction. Therefore, it is the body that must express the basis for *its* action. The Human Rights Department may state what it found, but we cannot tell from the record (other than by speculating as to its findings) what exactly the Board of Public Works found. It held, in effect, a de novo administrative hearing, took testimony, examined exhibits and, based upon its own hearing, imposed a 1–year suspension. Under these circumstances findings were required to have been made by the Board of Public Works.

We note that the WMBE ordinance does not explicitly require findings of fact. *See* SMC 20.46. Further, Merlino Construction never requested findings of fact. If not requested or required, the failure to make findings of fact is not *per se* a denial of due process. *State ex rel. Smilanich v. McCollum,* 62 Wn.2d 602, 606–07, 384 P.2d 358 (1963); *Ass'n for Retarded Citizens,* at 109. However, the hearing before the Board of Public Works was a quasi–judicial proceeding and written findings were especially apropos. Without written findings in a debarment proceeding, the reviewing court is not assisted in effectively evaluating the appropriateness of the sanction imposed. Written findings were also necessary because the Board was acting quasi–judicially as a fact finder. Furthermore, the Board was following general rather than specific standards. *Pentagram* states at page 228:

A difficulty arises in applying the arbitrary and capricious standard, however, when the administrative decision is guided by general rather than specific standards. In *State ex rel. Standard Mining & Dev. Corp. v. Auburn* [82 Wn.2d 321, 510 P.2d 647 (1973)], the court discussed *Zylka v. Crystal,* [283 Minn. 192, 167 N.W.2d 45 (1969)], where an ordinance governing the issuance of a special use permit did not specify standards to guide the administrative body in issuing or denying the permit. The *Zylka* decision held that in such a situation the administrative body must make findings of fact showing the basis upon which it denies the permit. In the absence of such findings

> the usual presumption of reasonableness does not attach to its decision, and the burden is upon the administrative body to show that the denial was not arbitrary or capricious. Arguments in favor of imposing these requirements, the court [in *Zylka*] said in a footnote on page 198, either by statute or by judicial decision include:
>> (1) To protect the applicant and the public from arbitrary action; (2) to prevent discrimination; and (3) to facilitate and confine the scope of judicial review. See, 2 Rathkopf, Zoning and Planning (3 ed.) p. 54–52; Note, 49 Minn. L. Rev. 973, 1000.

*State ex rel. Standard Mining & Dev. Corp. v. Auburn, supra,* at 327 n.3.

These principles apply to all quasi–judicial hearings. They apply to rezone hearings, to liquor law violations, and to human rights violations.

In K. Davis, *Administrative Law Text* § 16.03, at 320 (3d ed. 1972), we find:

> The practical reasons for requiring administrative findings are so powerful that the requirement has been imposed with remarkable uniformity by virtually all federal and state courts, irrespective of a statutory requirement. The reasons have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction.

Professor Davis then expounds on the reasons why admin-

istrative agencies should make findings of fact, and reiterates them as:

1. Findings give a reviewing court the chance to tell whether the basis (*i.e.*, the findings of fact) on which the administrative board acted was sustained by the evidence.

Professor Davis quotes from Justice Cardozo in *United States v. Chicago, M., St. P. & Pac. R.R.*, 294 U.S. 499, 79 L. Ed. 1023, 55 S. Ct. 462 (1935), as stating: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." Continuing, Professor Davis says: "If there were no law requiring findings, judges struggling with masses of evidence and hazy findings, trying their best to discover whether the agency has applied the proper principles, would surely invent such a requirement." K. Davis, at 321.

2. Findings should be required to prevent judicial usurpation of administrative functions.

3. Findings help protect against careless or arbitrary action.

4. Findings help parties plan their cases for rehearings and judicial review, and

5. Findings work to keep agencies within their jurisdictions.

I would find that the Board acted arbitrarily and capriciously by not publishing written findings of fact. When findings of fact are not issued, the proper remedy is a remand. *Andrew v. King Cy.*, 21 Wn. App. 566, 586 P.2d 509 (1978). As we have just stated in *Nagatani Bros. v. Skagit Cy. Bd. of Comm'rs*, 108 Wn.2d 477, 482, 739 P.2d 696 (1987):

> We emphasize the necessity of administrative bodies following the applicable statutes and the applicable written regulations and policies. An adequate record, including intelligible findings based upon the evidence presented to the decision makers, must be made to allow required judicial review.

The contractor violated the WMBE ordinance and a sanction is proper. However, the proceedings should be

conducted pursuant to law. The cause should be remanded for the entry of findings and the contractor's counsel granted time to prepare his presentation concerning the sanction to be imposed.

## APPENDIX

Mr. LOWTHIAN: In the past, at least on several issues, [tape not clear] I believe, of noncompliance issues in front of us we have given an opportunity to the participants to testify relative to the severity of the sanctions and I think that both Human Rights and Mr. Merlino should or his attorney should have an opportunity to at least address what sanctions the Board is considering so that we can have the benefit of whatever arguments they want to present so I think what I'm saying, Walt, is that maybe more testimony is appropriate as we deal with this question of sanctions.

We didn't really deal with it in the first part.

Mr. PERNSTEINER: That is correct. That has been our past practice. Perhaps we can defer consideration of whether or not to table the motion until both Human Rights and Gary Merlino Construction and Don Merlino have had an opportunity to address us this morning about the one you proposed be debarment. Would that be acceptable before we make a decision whether or not to table it?

Mr. HUNDLEY: Well, they got to testify against something. I made a motion saying a year. He says two years. If they just get up, they're going to say we don't think we deserve any sanction so I think we need to have a motion—

Mr. PERNSTEINER: No, we have the motion. The motion is on the floor. And that's what they would be commenting about.

Mr. ROCKEY: We haven't resolved whether it's just Gary Merlino Company and/or Don Merlino.

Mr. PERNSTEINER: At the present time in the motion it is both.

Mr. ROCKEY: It's both, but I think insofar as there's a couple of contracts being held in abeyance maybe, could we separate those two issues? Do you want to impose a sanction, impose it against the company and that would take care of these contracts in abeyance, decide later whether you do or do not want to impose a sanction on the individual? I tend to agree with Rod and I don't think the individual should be brought into the issue right now.

Mr. HUNDLEY: I don't know about what the legal research will discover but I would like to be able to find a way to prevent companies that are sanctioned from reforming with the same principals and if that takes a court case maybe we'll try it.

Mr. LOWTHIAN: Another option would be to table the motion and

receive testimony. [inaudible]

Mr. PERNSTEINER: Right, this morning.

Mr. LOWTHIAN: Right, that would give both Human Rights and Merlino the opportunity to give some consideration to the question and perhaps testimony could be more deliberate.

Mr. PERNSTEINER: Inherent, I think, Mr. Lowthian, in your suggestions is that an opportunity to consider those issues very carefully and that appears to be not to be permissible this morning. I don't know (inaudible) . . .

Mr. GAINER: Mr. Pernsteiner, can I comment on this issue? I agree with Mr. Hundley that it's important to address this issue and address it carefully about whether you can sanction or we as the City can sanction Mr. Merlino as a principal. I also think Mr. Rockey's point is well taken. There is a time consideration in consideration of sanctions against the Gary Merlino Construction so I would recommend that the Board not postpone the issue of sanctions against the company but rather, as Mr. Rockey suggested, separate the issues and consider sanctions against the company today. I'm willing to state again our position on sanctions for the Merlino Construction Company. Perhaps Mr. Merlino and Mr. Godsil can speak on behalf of the company here today and we can dispose of that issue. Then at a later date after the issue has been properly researched by the Law Department the Board can consider issuing sanctions against Don Merlino as principal.

Mr. KASEGUMA: Just let me make one statement, Mr. Chairman. I am very concerned in light of the fact that a number of individuals have indicated to me that no matter which way you vote, this will go to court. In that this proceeding has always been pursued in the matter of Gary Merlino Construction Company and today for the first time there's mention that Don Merlino as an individual will be sanctioned. Don Merlino as an individual has not been found in violation of the ordinance and never has been mentioned so perhaps if you wish you could vote today that for procedural reasons in this proceeding you could not find Don Merlino as an individual can be sanctioned and then we will have to have a continuance because it's very possible that we could have an individual be sanctioned but that the way you go about it is that you bring a proceeding against the company and against the individuals that you're concerned about.

Mr. PERNSTEINER: I would have a couple observations on that. The first is that Human Rights in its recommended sanctions did include Don Merlino. However, the motion that was made with respect to findings of noncompliance dealt only with Gary Merlino Construction Company. So that although, procedurally perhaps [Interjection by HUNDLEY: No, I made the motion.] No, this was Ken's motion on noncompliance.

Mr. LOWTHIAN: The issue of the individual hadn't been discussed at that time. The motion did say Gary Merlino Construction Company, yes.

Mr. AVERY: Well, Mr. Chairman, if the maker of the motion would care to change the motion at this point to include only the Gary Merlino Construction Company, I as second would agree to that presentation. The matter of the sanctions against Don Merlino, could as Mr. Gainer suggests, be considered as a separate matter. I think that's what Mr. Rockey suggested, and it seems to me that would make pretty good sense, and be consistent procedurally.

Mr. ROCKEY: Do you want to withdraw and remake your motion.

Mr. HUNDLEY: I'm thinking hard.

Mr. ROCKEY: Either forget Don's problem or have it researched by the Law Department and deal with it later.

Mr. PERNSTEINER: Mr. Gainer, you have indicated that the Human Rights is prepared today to discuss the matter of sanctions?

Mr. GAINER: Yes.

Mr. PERNSTEINER: Mr. Godsil, irrespective of the outcome of whether Mr. Hundley changes his motion or not, are you prepared on behalf of your client or is your client prepared to discuss the matter of sanctions today?

Mr. GODSIL: Well, I could only say that it doesn't look to us from our point of view here there's much to discuss. What would you propose to discuss, what aspect of this?

Mr. PERNSTEINER: As Mr. Lowthian has indicated, in past proceedings of this nature we have always given the contractor an opportunity to address the proposed sanctions and to make comments upon them.

Mr. GODSIL: I always seem to find that if you have a week or so to think things over, you come up with some ideas that might be appropriate to a proceeding like this and we would not be opposed to putting over until next Friday and we would be better prepared. We would discuss it among ourselves and see if there's anything we'd like to address to the Board concerning it. Off the top of my head here I can think of a few things but I would rather discuss them with Mr. Merlino before we would make a presentation to the Board.

Mr. ROCKEY: I think you're going to have a quorum problem if you start putting it off. Like Walt I agree what can they say except we don't think the substantial sanction is appropriate? We don't like two years. We don't like one year.

Mr. AVERY: If the two matters were divided and the motion were changed to include at this time only sanction against the company, that would not remove the issue of the sanction against Don Merlino. It would simply defer that, it seems to me, so it seems to me it would make good sense not to do that.

Mr. HUNDLEY: Well, we have got two things before us. One is what I heard as a request from the attorney for Merlino asking for a week's delay so he can prepare remarks addressing the sanctions and the other is whether or not I would change my mind. I would rather, if we're going

to give them a week to make an argument, I would rather keep my individual motion on the table and that would put some heat, I would hope, on the Law Department to get some opinion back to us so we can act next week for sure, for sure.

Mr. LOWTHIAN: May I ask, as far as attendance is concerned where do we stand?

Ms. TABER: Mr. Avery will be gone the next two Fridays.

Mr. HUNDLEY: But that still leaves us with a quorum.

Mr. KASEGUMA: It is my opinion that the documents submitted by Mr. Godsil on behalf of Gary Merlino Construction Company contain enough arguments regarding possible sanctions and the appropriateness of debarment from participation in the City to satisfy the type of notice and argument concern you have over whether they should have an opportunity to talk about sanctions.

Mr. GAINER: Mr. Pernsteiner, I also believe that the submittal by the Human Rights Department contains enough written statements and our position has been consistent through the proceedings. I don't see a need for a person to restate the position of sanction. I agree with Mr. Kaseguma that issue has been addressed both in writing and testimony before.

Mr. HUNDLEY: What's your ruling?

Mr. PERNSTEINER: If called upon for a ruling, Mr. Hundley, which I think you just did, I am going to have to declare the motion out of order because we did not find Don Merlino in noncompliance. [Interjection: can you speak up please, I can't hear you] I'm going to declare the motion on the sanctions as it is currently stated out of order because Don Merlino as an individual or principal of the firm has not been found in noncompliance by the Board's previous motion, which was to find Gary Merlino Construction Company in noncompliance. This is not to say that the subsequent motion could not do so. It's only to say that in terms of the motion that we did adopt, it was only for Gary Merlino Construction Company, and, therefore, the sanctions at this point, any motion for sanctions could only include Gary Merlino Construction Company. I guess that throws the motion out. Sorry, Walt. We can move to deal with the issue of Don Merlino in compliance or noncompliance if you wish or move to sanctions with respect to the company. I will entertain motions on either of those.

Mr. HUNDLEY: I would move that we find Don Merlino in violation of the WMBE ordinance requirements, that we find Don Merlino in addition to the Gary Merlino Construction Company in noncompliance with the WMBE ordinance.

Mr. AVERY: Second.

Mr. PERNSTEINER: It's been moved and seconded that the Board find Don Merlino in addition to Gary Merlino Construction Company in violation of the WMBE ordinance. Mr. Kaseguma, is that motion crafted

correctly?

Mr. KASEGUMA: Was the last part in violation of the WMBE Ordinance?

Mr. PERNSTEINER: In noncompliance of the WMBE Ordinance.

Mr. KASEGUMA: State it again, please.

Ms. TABER: To find Don Merlino in addition to Gary Merlino Construction Company in noncompliance with the WMBE ordinance.

Mr. LOWTHIAN: May I suggest that it be worded similar to the earlier motion that included language relative to the failure to meet the MBE set–aside—

Mr. KASEGUMA: This presents a sort of problem, I suppose our contract is with Gary Merlino Construction Company. The original violation on the order reads that Gary Merlino Construction Company has been found to be in noncompliance with the WMBE Ordinance due to failure to meet the WMBE set–aside requirements which only the Gary Merlino Construction Company can violate. Don Merlino has never told us that he (inaudible) set–aside. So if that motion is to stand and be voted on you have to make some findings as to what it is Don Merlino did that was in violation of the Ordinance. It may or not be what the Gary Merlino Construction Company did in the contract and I have not had a chance to really think about this much and I can see where you need some direction on this. This may be something that we should hold over for a week.

Mr. ROCKEY: Mr. Chairman, I think my original statement of separating the issue is still valid. I think we could take care of Don Merlino whether we can or cannot find him in noncompliance and sanction him at some later date, 2 or 3 weeks in the future if you want, but I think you can deal with the Gary Merlino Construction Company if you so wish. If I could make motions I would but I can't.

Mr. KASEGUMA: I agree with Mr. Rockey.

Mr. PERNSTEINER: I sense some concern on the part of the Law Department about how and under what circumstances the Board may deal with noncompliance by an individual rather than by a firm. Therefore, I think it might be in our best interest to refer our motion to the Law Department for its consideration and recommendation prior to taking any action on it. Is that okay with you, Mr. Hundley?

Mr. HUNDLEY: Okay.

Mr. PERNSTEINER: Rod, when do you think you could address the legal issues, if you will, involved in this? Admittedly we don't pretend to understand.

Mr. KASEGUMA: Are you going to have a quorum next Friday?

Mr. PERNSTEINER: We will have a quorum.

Mr. KASEGUMA: I won't personally be able to handle it but we will try our best to have the department as a whole.

Mr. LOWTHIAN: I think it's in order that we table the motion for one

week.

Mr. PERNSTEINER: Is there a second to Mr. Lowthian's motion to table the motion before us?

Mr. HUNDLEY: I'll second it.

Mr. PERNSTEINER: It's been moved and seconded that the motion be tabled and it's assumed within that, I believe, to be a referral to the Law Department. Those in favor please say aye. Those opposed? The chair votes aye, the motion is carried. We have tabled the motion until next week and referred the matter to the Law Department for advice.

Mr. ROCKEY: Mr. Chairman, I think it's fair to say that Mr. Saven probably will not be voting on this issue when it comes up in [sic] though he's a member of the quorum.

Mr. PERNSTEINER: I believe, Mr. Rockey, we'll have a quorum without Mr. Saven.

Mr. ROCKEY: But what I'm saying is he would probably abstain since he has not heard any of the testimony.

Mr. PERNSTEINER: I understand.

Mr. HUNDLEY: Is my other motion still on the floor?

Mr. PERNSTEINER: No, because I will entertain a motion with respect to sanctions against the Gary Merlino Construction Company if there is such a motion.

Mr. HUNDLEY: Well, I would move my original motion but dropping the Don Merlino name but I add to the motion with the understanding that possible sanctions against Don Merlino the individual will be discussed and voted upon at our next regular meeting.

Mr. PERNSTEINER: Again, I think I have to rule that portion out of order because we have not dealt with Don Merlino's noncompliance or compliance with the ordinance and the WMBE provisions.

Mr. HUNDLEY: But we're going to. All I said is we're going to discuss, and then take a vote.

Mr. AVERY: Walt, can I suggest you make those two motions, one dealing with the company and then if you wish to make a motion (inaudible).

Mr. PERNSTEINER: I think Mr. Hundley the fact that we have made a motion to refer to the Law Department contains within it the sense of the additions you wish to put on the other motion.

Mr. HUNDLEY: Well, I wanted to be sure that the message got across and also to this Board, I even tinkered with the motion after this one to talk about taking an action to be in communication with the Law Department indicating that this Board is interested in being able to prevent contractors from violating our laws and then reforming companies and continuing to do business with the City and that is why I keep adding these things on which you guys find objectionable because I think we really ought to make that statement somehow.

Mr. PERNSTEINER: I suspect, Mr. Hundley, that the appropriate form for that is not in this motion. That is an important question. It's one we

have dealt with before and not just with respect to WMBE but with respect to companies that have otherwise defaulted on contracts and reappear in a new form. I know it's one the Board is very concerned about but I do not believe that it is in order at this time to append that to a motion regarding proposed sanctions against Gary Merlino Construction Company.

Mr. KASEGUMA: Mr. Chairman, we'll certainly look at that issue as we're determining what to do with Don Merlino and report back if we can next Friday.

Mr. HUNDLEY: With that I'll drop my last phrase.

Mr. PERNSTEINER: So your motion, if Barbara could read it for us.

Ms. TABER: Well, I'm probably as confused as everybody else here. It's my understanding your motion was to impose sanctions of one year's debarment effective immediately against the Gary Merlino Construction Company.

Mr. HUNDLEY: Right.

Mr. AVERY: Second.

Mr. PERNSTEINER: It's been moved and seconded that Gary Merlino Construction Company will be debarred from supplying goods and services to the City of Seattle for a period of one year effective immediately. Is there any discussion?

Mr. LOWTHIAN: I repeat that I think it would be appropriate to allow the parties at this hearing to respond to the issue before we take a vote.

Mr. PERNSTEINER: All right, I would agree with that and I would first turn to Mr. Gainer (inaudible) to do you have anything you wish to say.

Mr. GAINER: Mr. Chairman and members of the Board: I believe it is appropriate to sanction the Gary Merlino Construction Company by debarment. Again, our position from the beginning has been, given the facts of this case, that a period of two years is appropriate but if the Board is not willing to consider such a motion and has made one so, I presume this is the best the Board is willing to offer. I think it is an appropriate case for serious sanction. A year's debarment is a serious sanction and I would support that sanction to be imposed against the Gary Merlino Construction Company. I have a small problem with the exact wording of the motion, however. In the past, specifically in the case of the Moseman Construction Company, that firm was debarred from providing goods and services to the City of Seattle for two years following the completion of the then proceeding Contract No. 7 with the City. I think that action was phrased in that way to permit Moseman to complete its then current contractual obligation and not truncate that contract.

It's my understanding that the Gary Merlino Construction Company may have several contracts in process with the City at this time and I would recommend that the Board take a similar approach to debarment in this case; that is, that the debarment begin to run from the date of the

conclusion of the last contract completed that Gary Merlino Construction Company has at this time. That is one part of my comment. The other is regardless of what Mr. Godsil and Mr. Merlino will tell you today about, this was an innocent mistake and the sanction is not appropriate, I will point out that Mr. Merlino was quoted in the media as saying that he is quite unconcerned if the City debars him from providing services for even two years. He is such a good contractor with such wide ranging work and it wouldn't hurt him, the company, to have this penalty imposed. Well, that being the case I don't think you should really be too concerned that this is somehow going to inconvenience or cause loss of profits to the Gary Merlino Construction Company. They take the approach that they don't need you. Fine. Who else would?

Mr. ROCKEY: Mr. Gainer, your suggestion that the debarment occur after the completion of the contract creates a problem. That means they could bid work until that contract is complete. There's no end [HUNDLEY: There's a [motion] sitting on the table now] I know there's two on the table now. I think the proper suggestion would be if there's going to be a debarment, it should be from providing bids, goods and services starting now, and not related to any ongoing contract so I just wanted to correct that.

Mr. GAINER: Well, perhaps, first we should confirm whether there are any ongoing contracts.

Mr. PERNSTEINER: Let me ask a question to Mr. Kaseguma. Rod, I can understand some of the implications of what Mr. Gainer is saying with respect to the phraseology that we have used, it has several implications, the one that Mr. Rockey stated being one. Another implication being if we do not amend it, it is conceivable that we are barring Gary Merlino Construction Company from finishing jobs that it currently has under way and that is certainly not the intent here. Would it be better to have the motion read something to the effect that we would accept no bids and award no contracts, no bids from and award no contracts to the Gary Merlino Construction Company with respect to supplying goods and services to the City of Seattle for a period of one year? In other words, from this day forward we'll accept no bids for that period.

Mr. ROCKEY: Or make awards.

Mr. PERNSTEINER: And/or make awards, that's right.

Mr. KASEGUMA: That would be fine if there is work still outstanding on previous contracts.

Mr. PERNSTEINER: Mr. Neiforth, is there work outstanding?

Mr. NEIFORTH: Yes, there's still work to be done.

Mr. KASEGUMA: Sounds fine to me.

Mr. PERNSTEINER: Is that would someone—

Mr. HUNDLEY: So moved.

Mr. AVERY: When I made the second it was my intention and understanding we were talking about award of new contracts and in no way

were we talking about cutting off existing contracts and indeed I'm not sure that we even could with an existing contractual relationship.

Mr. HUNDLEY: If it will make everybody happy, I move as George and Rod said.

Mr. PERNSTEINER: Thank you. Mr. Merlino or Mr. Godsil, do you have any comments to make?

Mr. GODSIL: Well, what I think what bothers me about what is happening here in the discussion is just as if it were a foregone conclusion that the entire Board was going to vote in favor of this motion. The attitude of Mr. Gainer or some of the questions from the Board appear to me to be that is the foregone conclusion and, again, we have to listen here. We can't talk while we're listening. I can't talk with my client. I don't know what he feels about the situation. I know he doesn't approve of it, of course, but I would ask that the matter—if we're going to put this over until next Friday of other proceedings I don't see what difference it makes if we put the entire thing over until next week to give me a chance to discuss it with my client and the only thing that comes to my mind is the only case I can recall where there's any precedent for this is the Alia case.

Like I said, I don't know anything about the Moseman case and I was here the day Board ruled on that. Mr. Alia wasn't even here. He didn't even use a WMBE that he said he was going to use. The sanction was for six months which was later turned around and not enforced; and lawyers and what have you, you were asked that we be governed by a set of rules, that the men are to abide by the set of rules and there just doesn't seem to be any set of rules, whether it was a violation or sanction, by which we can judge our conduct and how do you justify six months to somebody that flagrantly failed to do anything to a contested situation like this where you ask for a year's sanction so we would maybe want to take a look at those types of things to present some further statements next week.

Mr. PERNSTEINER: Thank you. Any questions by the Board?

Mr. ROCKEY: If we're going to have discussion on the motion I'd kind of like to venture my opinion even though I don't get to vote on the motion.

Mr. PERNSTEINER: I think the first thing we should deal with Mr. Rockey, is what appears to be a request from Mr. Godsil to hold this matter over for one week. What is the thinking of the Board?

Mr. LOWTHIAN: Well, it has been the Board's past practice to allow that to happen and I think it was based in part at least on advice from the Law Department relative to the process and an opportunity for those people who we're taking sanctions on, an opportunity to look at the case and come back and discuss it with the Board. It would be my preference, I think to lay it over.

Mr. PERNSTEINER: Now this matter has come up before. Mr. Clark and

Mr. Howell, there are bids pending. Will the sixty–day period on any of those bids expire between now and next Friday?

Mr. HOWELL: No. Easement East of 25th is June 29.

Mr. PERNSTEINER: June 29th, and that is the first one?

Mr. HOWELL: Yes.

Mr. HUNDLEY: Well, Mr. Chairman, I disagree. I'd like to get this done. This is two all day Fridays and you know we just come back here to talk about a statement about the proposed sanctions, we're going to hear from everybody and everything and we'll be here all morning again and I would like to get back to the office one of these Fridays at a reasonable hour.

Mr. ROCKEY: I tend to think with Walt. I think you ought to address the issue.

Mr. AVERY: Mr. Chairman, I'm prepared to vote on it this morning. I realize that there's a practice of the Board to allow time for discussion but I guess I would argue that we deal with it this morning rather than laying it over.

Mr. ROCKEY: I would think if they come up with some factual information they could always ask for a reconsideration if they deem it appropriate. I think we can dispose of this.

Mr. PERNSTEINER: I believe there's a majority of the Board that wishes to address today so we will proceed to a discussion of the motion. The motion before us again is that the City will accept no bids from or award no contracts to Gary Merlino Construction Company for supplying goods and services to the City of Seattle for a period of one year beginning today. All right, any discussion on that?

Mr. ROCKEY: Can I venture my opinion now?

Mr. PERNSTEINER: Yes. Rod apparently was disagreeing with the way I was phrasing something. Did I do something wrong?

Mr. KASEGUMA: I just have a comment to make Mr. Chairman. I just wanted to clarify a statement made by Mr. Rockey: You do not have wide ranging authority to reopen this proceeding once you have declared the violation and proposed the sanctions. You can only reopen it if you have improperly applied the law, or something of that nature. You cannot reopen it to (inaudible) more facts, so if you take the vote now this is the end of it.

Mr. ROCKEY: Unless you end up in Superior Court. Thank you for the correction.

Mr. PERNSTEINER: Does that change the preference to end the matter today? Mr. Rockey.

Mr. ROCKEY: Not mine. In any alleged crime I think the punishment should fit the crime. I have gone over this material two or three times and listened to all the testimony and I have some real problems with the sanction and how big a sanction. I think they're guilty of sloppy book-keeping. I think they have had some problems in what they're doing. I

think there's some arguments about whether there are rules so that the contractors know how to play by the rules. I think the practice is, common practice, I've done some checking in the contracts with the City Light and I find out the same thing happened there and it is after the fact so it is very common practice out there so I really consider in my mind I think the punishment in the motion maybe is a little too severe. I would think if there's going to be any sanction at all in my opinion it should be on the order of about six months to consider when you vote the motion.

Mr. PERNSTEINER: Any other comments?

Mr. LOWTHIAN: I also agree that the sanctions vary, I guess. As we look at sanctions that have been imposed in the past and the nature of the violation it appears that the nature of this particular violation is one which the Board has seen as appropriate for a six months debarment. I guess I would like to ask the maker of the motion, you indicated a year's—could be the appropriate sanction, to explain his rationale, that would be helpful.

Mr. HUNDLEY: As I look at the sheet that Barbara prepared for us reviewing previous actions, I think this is really consistent with the effort before us in these earlier ones. I think we did try to tailor our sanctions to what evidence we had before us and in this case with Alia which keeps getting mentioned I'm not aware that the Board changed its mind on anything. I know they asked for an appeal but the six months debarment and then a six months probation but isn't that where we also had the money?

Ms. TABER: It's my understanding that the original debarment was for one year. The Board changed that after a period of six months. Excuse me, Mike do you want to clarify?

Mr. PURDY: The original debarment was for six months and about three months into that six months the Board lifted that debarment.

Mr. PERNSTEINER: On the recommendation jointly of the Human Rights Department and the contractor. In fact, it wound up being a three month debarment and a nine month probation.

Mr. HUNDLEY: Well, I must have been absent that day, because I sure wouldn't have voted for it. I think that if you averaged the kind of actions we have taken, this is consistent for what I consider a fairly serious deviation from our ordinance. I also feel that in relation to Rockey's statement, that there's too much of this sort of thing going on out there and some of us have winked our eyes at it and maybe even connived in it and hopefully this will signal the rest of us and the industry that it's not to be permitted.

Mr. PERNSTEINER: Any other comments? I am concerned, too, about all of the issues that everyone has raised. This is a confusing case. It's one in which the issues are probably not as clear-cut as we would like them to be. One of the things that is particularly bothersome is a larger question,

how do you deal with noncompliance when you're well into the contract? I think Mr. Gainer raised a very interesting point and it's one I don't have an answer to. How do you conciliate which by ordinance the Human Rights Department is required to do? How do you do that? And that makes it not only difficult for Human Rights but it makes it difficult for the contractor as well. How does the contractor make good the commitment in a situation like that? I don't know that we have here, though a situation that is not one that ought to be sanctioned. I think that it is. I think we're in a situation where the clarity of the roles among prime and sub is not what we expect and have expected and have dealt with in other cases and that is the sort of thing that really in a lot of jobs is about all Human Rights has to go on if it goes back to audit which means that if we don't make a strong statement that we want clarity of the individual roles of the subs and the prime, make it very, very difficult in the future for us or for the City, rather, to deal with issues of compliance or noncompliance. I think we have to make that clear; you have to make that clear now. I'm willing to support the motion. It's not without a lot of thought and it's not without a lot of discomfort. It's not one that I'm thrilled with but it's one I think that is reasonable in this case. For that reason—

Mr. AVERY: Mr. Chairman, you have expressed some of the feelings that I've had about the motion. I second the motion and support it because it does seem to me that there has been a clear–cut violation here. I am also troubled by some of the apparent ambiguities and it was for that reason that I felt that the two year recommendation was somewhat excessive for the circumstances. It does seem to me that a six months debarment considering the nature of the violation would be too light and that the one year is about the right level. Two years does seem to be excessive so I agree with Mr. Hundley that within the realm of the time element that is available to us, one year seems to be appropriate.

Mr. PERNSTEINER: Is there any further comment or discussion? If not, those in favor of the motion that the City should accept no bids from and award no contracts to the Gary Merlino Construction Company for supplying goods and services to the City of Seattle for a period of one year from today please say aye. Those opposed? The Chair vote aye, the motion is carried.

DURHAM, J., concurs with CALLOW, J.

Reconsideration denied September 15, 1987.